*United States v. Peguero*

# United States Court of Appeals

## for the Second Circuit

_____

August Term 2021

(Argued: December 7, 2021    Decided: May 13, 2022)

No. 20-3798

_____

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

CARLOS PEGUERO, AKA JAY,

*Defendant-Appellant.*∗

_____

Before:        SACK, BIANCO, *Circuit Judges*, and UNDERHILL, *Chief District Judge.*∗∗

---

∗ The Clerk of the Court is respectfully instructed to amend the caption to conform with the above.

∗∗ Judge Stefan R. Underhill, Chief United States District Judge for the District of Connecticut, sitting by designation.

Defendant-Appellant Carlos Peguero appeals from a November 4, 2020 judgment of the United States District Court for the Southern District of New York (Román, *J.*) revoking his term of supervised release and sentencing him to a total term of 28 months' imprisonment for violations of multiple conditions of his supervised release.

On appeal, Peguero challenges his revocation on Specification Four, which alleged that, on May 12, 2019, Peguero committed the state crime of second-degree assault in violation of New York Penal Law § 120.05(2) by striking his ex-girlfriend ("J.D.") with a deadly weapon or dangerous instrument—namely, a glass bottle. First, Peguero argues that the district court abused its discretion by finding that he committed the second-degree assault even though there was no finding or evidence that he had caused the injury to J.D. by using the glass bottle, rather than his hand. Second, Peguero contends that the district court abused its discretion in finding "good cause" under Rule 32.1(b)(2)(c) of the Federal Rules of Criminal Procedure for the admission of J.D.'s sworn, out-of-court statement into evidence without requiring her to testify in person at the revocation hearing and, in doing so, violated his due process and confrontation rights. Finally, Peguero challenges the judgment as to Specification Nine because, as the government concedes, the written judgment incorrectly indicates that he committed Specification Nine, which the district court orally pronounced was unproven.

We hold that the district court did not abuse its discretion in finding that Peguero committed Specification Four by a preponderance of the evidence or by finding good cause to admit the out-of-court statement under Rule 32.1(b)(2)(c). In addition, although not argued by Peguero, the dissent concludes that, because the charged supervised release violations subjected Peguero to imprisonment for more than one year based on new conduct for which he was never federally indicted, the violation proceedings constitute a new prosecution that violated Peguero's Fifth and Sixth Amendment rights. We respectfully disagree.

Finally, as to Specification Nine, we agree with the parties that the written judgment conflicted with the district court's oral ruling that the alleged violation had been proven, and that the oral ruling controls.

Accordingly, we **AFFIRM** the judgment of the district court except as to Specification Nine and **VACATE** in part and **REMAND** for amendment of the judgment as to Specification Nine only.

JUDGE UNDERHILL dissents in a separate opinion.

SHIVA H. LOGARAJAH, Assistant United States Attorney (Hagan Scotten, Assistant United States Attorney, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY.

JOSEPH A. VITA, Joseph A. Vita Law Office, Port Chester, NY.

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Carlos Peguero appeals from a November 4, 2020 judgment of the United States District Court for the Southern District of New York (Román, *J.*) revoking his term of supervised release and sentencing him to a total term of 28 months' imprisonment for violations of multiple conditions of his supervised release.

On appeal, Peguero challenges his revocation on Specification Four, which alleged that, on May 12, 2019, Peguero committed the state crime of second-degree assault in violation of New York Penal Law § 120.05(2) by striking his ex-girlfriend ("J.D.") with a deadly weapon or dangerous instrument—namely, a glass bottle. First, Peguero argues that the district court abused its discretion by finding that he committed the second-degree assault even though there was no finding or evidence in the record that he had caused the injury to J.D. by using the glass

3

bottle, rather than his hand. Second, Peguero contends that the district court abused its discretion in finding "good cause" under Rule 32.1(b)(2)(c) of the Federal Rules of Criminal Procedure for the admission of J.D.'s sworn, out-of-court statement into evidence without requiring her to testify in person at the revocation hearing and, in doing so, violated his due process and confrontation rights. Finally, Peguero challenges the judgment as to Specification Nine because, as the government concedes, the written judgment incorrectly indicates that he committed Specification Nine, which the district court orally pronounced was unproven.

We hold that the district court did not abuse its discretion in finding that Peguero committed Specification Four by a preponderance of the evidence or by finding good cause to admit the out-of-court statement under Rule 32.1(b)(2)(c). In addition, although not argued by Peguero, the dissent concludes that, because the charged supervised release violations subjected Peguero to imprisonment for more than one year based on new conduct for which he was never federally

indicted, the violation proceedings constitute a new prosecution that violated

Peguero's Fifth and Sixth Amendment rights.  We respectfully disagree.

As a threshold matter, the dissent's proposed holding is inconsistent with well-established precedent in this Circuit, which we are duty-bound to follow. Moreover, that binding precedent rests on sound constitutional footing because of the following indisputable facts regarding supervised release: (1) a supervised release term is a component of the initial sentence for the underlying crime that can only be imposed after the defendant received the full constitutional protections afforded in a criminal prosecution and was adjudicated to be guilty; (2) as a result of the initial sentence, the maximum term of imprisonment that the defendant can face is his initial custodial sentence *plus* additional imprisonment for violations of supervised release up to the maximum term of supervised release authorized by statute for the underlying offense (subject to the exceptions in 18 U.S.C. § 3583(e)(3)); and thus, (3) at the time of the initial sentence, the defendant's continued liberty after serving the imposed term of imprisonment on the underlying crime is conditioned upon complying with all of the terms of supervised release (including not committing new criminal conduct) during the period of such release.  Thus, there is no basis, either factually or legally, to classify

a revocation of supervised release as a new "criminal prosecution" that triggers all the constitutional protections afforded to such a prosecution. Instead, it is simply a revocation of the conditional liberty that was imposed by the judge as a component of the initial sentence, and thus, like a revocation of parole or probation, it need only comply with basic due process.

In reaching a contrary conclusion, the dissent suggests that the full constitutional protections for a criminal prosecution should exist for supervised release violations only involving new conduct punishable by more than one year in prison, and not at all for violations of parole or probation. The grounds for such distinctions, however, are difficult to discern as a legal matter even under the dissent's own analysis.

Finally, as to Specification Nine, we agree with the parties that the written judgment conflicted with the district court's oral ruling that the alleged violation had been proven, and that the oral ruling controls.

Accordingly, we **AFFIRM** the judgment of the district court except as to Specification Nine and **VACATE** in part and **REMAND** for amendment of the judgment as to Specification Nine only.

**BACKGROUND**

## I.  Initial Offense and Prior Supervised Release Violations

In 2006, Peguero was charged in a three-count indictment in connection with his participation in a 2004 armed bank robbery in Ardsley, New York, namely: (1) conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371; (2) bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d) and 2; and (3) using a firearm during the bank robbery, in violation of 18 U.S.C. § 924(c).  On May 7, 2007, Peguero pled guilty to the first two counts pursuant to a plea agreement with the government and, that September, was sentenced principally to 100 months' imprisonment, to be followed by a five-year term of supervised release.[1] As a component of the standard conditions of his supervised release, Peguero was required to not commit a new federal, state, or local offense.  *See* 18 U.S.C. § 3583(d).

Following the completion of the term of imprisonment on the underlying conviction, Peguero violated the terms of his supervised release.  In particular, on April 1, 2015, Peguero pled guilty to the state crime of criminal contempt, as well

---

[1] Peguero's case was initially assigned to the Honorable Charles L. Brieant, who imposed his original sentence on September 11, 2007.

as the use of cocaine. For those violations, the district court revoked Peguero's supervised release and sentenced him to 8 months' imprisonment, to be followed by a new 24-month term of supervised release. After completing his new term of imprisonment, and during his second period of supervised release, Peguero again pled guilty to violating the conditions of release by engaging in new criminal conduct—namely, endangering the welfare of a child.[2] Based upon that violation, the district court revoked Peguero's supervised release and imposed a new 24-month term of supervised release. Peguero began that term of supervised release on June 7, 2018.

## II. Instant Supervised Release Violations

During his third term of supervised release, Peguero was arrested multiple times for various alleged criminal activities, including, as relevant to this appeal, two arrests for domestic violence.

The first alleged domestic violence incident occurred on May 12, 2019, near Fishkill, New York (the "Fishkill Incident"). According to the Dutchess County

---

[2] Specifically, Peguero pled guilty to "knowingly act[ing] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old by causing such injury to the victim . . . by punching said child in the eye with a closed fist, causing her substantial pain including a fractured orbital bone, bruising and swelling" in violation of New York State Penal Law § 260.10. Dist. Ct. ECF No. 55 at 1–2.

8

Criminal Complaint, Peguero physically assaulted and injured his ex-girlfriend, J.D., and ripped her television off the wall and threw it on the ground, breaking it. The day after the alleged assault, J.D. gave a sworn, signed statement to a detective with the Town of Fishkill Police Department (the "Fishkill Statement") describing how, after she had confronted Peguero with evidence of his infidelity she had discovered on his phone, Peguero punched, kicked, and choked her, telling her, "I hate you and want you dead[.]" Joint App'x at 146. In the statement, J.D. also declared that, "at one point [Peguero] picked up a glass 'make up' bottle[,] held it in his left hand[,] and hit me on top of my head with it causing pain, blood and feel dizzy [sic] to the point I thought I was going to pass out." Joint App'x at 147.

The second alleged incident occurred on September 3, 2019, in Yonkers, New York (the "Yonkers Incident"). According to the Yonkers Police Department ("YPD") incident report, a YPD officer responded to a reported violation of an order of protection at Peguero's parents' apartment, where J.D. was visiting at the time. When Peguero arrived at the apartment, he allegedly became angry with J.D. and proceeded to punch and choke her before fleeing the scene. The YPD report noted that J.D. had visible injuries, including bruising and swelling on her

9

neck, which were also observed by medical professionals at the hospital where J.D. was taken after the alleged assault.

On October 28, 2019, J.D. wrote to both the Dutchess County and Westchester County prosecutors, stating that she wanted to "drop all domestic violence charges against Carlos Peguero" and that she was "not being forced or harassed" in making that decision. Joint App'x at 167. Both counties subsequently dismissed all charges.

On September 15, 2020, in an amended violation petition, the United States Probation Department alleged that Peguero had committed twenty-two violations of his conditions of supervised release in connection with his alleged state criminal conduct. The government did not pursue nine of the specifications (Specifications Six and 15 through 22). Peguero contested six of the remaining 13 alleged violations[3]—namely, Specifications Four, Five, and Seven through Ten.

Specifications Four and Five arose from the Fishkill Incident and alleged, respectively, that Peguero: (1) committed assault in the second degree, in violation

---

[3] Peguero admitted his guilt to seven of the violation specifications at a revocation hearing on July 16, 2020. Specifically, he admitted to committing the state crimes of aggravated unlicensed operation of a motor vehicle in the first degree and of driving while his ability was impaired by alcohol. Additionally, he admitted to failing to notify his probation officer of a change of address, failing to follow the instructions of his probation officer and surrender to the YPD, failing to report for scheduled drug testing, using a controlled substance (cocaine), and failing to participate in his substance abuse treatment program.

of New York Penal Law § 120.05(2), by striking J.D. on the head with a glass bottle, resulting in a head laceration; and (2) committed criminal mischief in the fourth degree, in violation of New York Penal Law § 145.00(1), by destroying J.D.'s television. Specifications Seven, Eight, and Ten arose from the Yonkers Incident, alleging that Peguero's assault of J.D. constituted: (1) criminal assault in the third degree, in violation of New York Penal Law § 120.00(1); (2) criminal obstruction of breathing or circulation, in violation of New York Penal Law § 121.11; and (3) harassment in the second degree, in violation of New York Penal Law § 240.26(1). Finally, Specification Nine alleged that Peguero committed criminal contempt in the second degree by having contact with J.D., in violation of a state order of protection and New York Penal Law § 215.50(3). The district court scheduled a revocation hearing on these alleged violations for October 8, 2020.

### A. Admission of Fishkill Statement

Law enforcement officers made several attempts to contact J.D. in order to serve a subpoena on her for in-person testimony at the scheduled revocation hearing. On September 10, 2020, an FBI Task Force Officer attempted to serve a subpoena on her at her last known address. Instead of reaching J.D., the officer was met by one of her children, who stated that J.D. was in the hospital. A few

11

days later, on September 16, 2020, a Fishkill Police Officer attempted to follow up with J.D., who was again not present. Later that day, law enforcement finally reached J.D. on the phone, and she refused to appear at Peguero's hearing. The next day, a Fishkill Police Officer again contacted J.D., who informed the officer "that she did not want to testify [against Peguero] because she had suffered seizures and anxiety from both incidents [of domestic violence] and was afraid of having to relive them and retrigger her medical issues." Joint App'x at 174–75. Prior to Peguero's scheduled revocation hearing on the contested specifications, the government, anticipating that J.D. would be unavailable to testify due to her unwillingness to do so, moved to admit the out-of-court statements she had made to law enforcement about the alleged assaults, including, as relevant here, the Fishkill Statement. The district court granted the motion, concluding that the Fishkill Statement was admissible pursuant to Federal Rule of Criminal Procedure 32.1(b)(2)(C), which provides that a defendant in a supervised release hearing is entitled to "an opportunity to . . . question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). In reaching this conclusion, the district court reasoned that there was "good cause" to admit the statement without requiring

12

J.D. to testify—namely, "her fear of suffering medical consequences and her history of abuse at the hands of [Peguero]." Joint App'x at 179. Additionally, the district court determined that the statement was sufficiently reliable to admit, as it was sworn, signed, and consistent with J.D.'s other statements as well as Peguero's own statements.[4]

## B.    Revocation Hearing

A revocation hearing regarding the contested specifications was held on October 8, 2020. To prove the specifications related to the Fishkill Incident, the government presented the testimony of Fishkill Police Officer Nesbitt, who testified that he responded to a 911 call of a domestic incident on May 12, 2019. When he arrived at the scene, he spoke to the caller, J.D., who was "[u]pset, crying, [and] disheveled," and who told him that Peguero, her boyfriend at the time, had punched her and "hit her in the head." Joint App'x at 80, 82. Officer Nesbitt further testified that he observed a "laceration" or "abrasion" on J.D.'s head, consistent with her statements, and confirmed that she was taken to a hospital for medical treatment. Joint App'x at 83–84. He also stated that he observed property

---

[4] The district court also admitted several other of J.D.'s out-of-court statements—such as her recorded calls to 911 and statements she made to both responding officers—as excited utterances under Federal Rule of Evidence 803(2) and under Rule 32.1(b)(2)(C). Peguero does not challenge the admission of these other statements on appeal.

damage in the home, including a broken television. On cross-examination, Officer Nesbitt confirmed that the domestic incident report he prepared at the scene—signed by J.D. and containing her statements—did not mention Peguero using a weapon or sharp object to assault her, and that no such item was recovered by law enforcement.[5] Joint App'x at 87, 90. The government also presented the testimony of Fishkill Detective DeMarco, who met with J.D. the day after the assault and took her signed, sworn statement. Additionally, the government played a recording of a phone call Peguero made from jail, in which Peguero "belittl[ed]" J.D., asked about her cooperation with law enforcement, and stated "she was going through my phone looking at sh**, so that's what you get." Dist. Ct. ECF. No. 73 at 2.

To prove the specifications related to the Yonkers Incident, the government presented the testimony of YPD Officer Michael Derosa, who responded to J.D.'s 911 call on September 3, 2019. Officer Derosa testified that J.D., who was "[v]isibly upset and crying," told him that Peguero "struck her with a closed fist multiple times in the head, left abdomen area and her chest." Joint App'x at 106, 108. Officer Derosa further testified that he had "observed bruising and swelling to her

---

[5] In response to questions from the district court, Officer Nesbitt confirmed that he did not find "any sharp objects like a knife [or] scissor" in his walkthrough of J.D.'s apartment, which was generally "disheveled" and "disorganized." Joint App'x at 90–91.

14

head, neck area and left arm," and noted that J.D. "complained about substantial pain to her left abdomen area." Joint App'x at 108. He also stated that J.D. was transported to a hospital for medical treatment, which was corroborated by medical records introduced by the government documenting the "multiple contusions" on J.D.'s body as well as the "stress marks" on her neck. Joint App'x at 123. Additionally, Officer Derosa testified that J.D. had reported that, at the time of the incident, she had "an order [of protection] against [Peguero]." Joint App'x at 107.

Peguero did not offer any evidence in his defense but, instead, argued that there was insufficient proof to demonstrate: (1) that he was aware of and knowingly violated the order of protection against him at the time of the Yonkers Incident, as required by the New York State Penal Law underlying Specification Nine; and (2) that he assaulted J.D. with a weapon during the Fishkill Incident, as required under the New York State Penal Law underlying Specification Four.

At the end of the hearing, the district court issued an oral decision finding that the government had proved by a preponderance of the evidence, as required by 18 U.S.C. § 3583(e)(3), that Peguero committed all of the challenged specifications, with the exception of Specification Nine. As to that specification,

15

the district court found that the government failed to introduce the actual order of protection or otherwise present evidence that there was, in fact, an order of protection on the date of the alleged assault. As to Specification Four, the district court held that the evidence demonstrated that Peguero "punched his girlfriend in the head and about the body while holding a glass bottle in his hand," causing bruising and "a laceration to the head for which the victim required medical attention." Joint App'x at 131.

C.    Sentencing

On November 4, 2020, after hearing arguments from both sides, the district court revoked Peguero's term of supervised release and sentenced him to a total of 28 months' imprisonment, with no new term of supervised release to follow. More specifically, the district court sentenced Peguero to 28 months on Specification Four (Assault in the Second Degree), 27 months on Specification One (Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree), and 14 months on the remaining violations that were found proven at the hearing or to which Peguero pled guilty (that is, Specifications Two, Three, Five through Eight, and Ten through 14), with each sentence running concurrently to each other. The remaining specifications (Specifications Six and 15 through 22), which the

16

government did not seek to prove, were dismissed during the sentencing at the government's request.

Although the district court found during the revocation hearing that Specification Nine was not proven, and it was not mentioned by the district court in imposing Peguero's sentence, the district court's written judgment indicated that Peguero had committed Specification Nine in disobeying a court order and had received a concurrent 14-month sentence for that violation.

This appeal followed.

## DISCUSSION

Peguero raises three claims on appeal. First, as to the state felony offense of second-degree assault charged as the basis for Specification Four, Peguero contends that the district court failed to make the requisite finding that he caused injury to J.D. by means of a deadly weapon or dangerous instrument (rather than only with his hand) and, in any event, the evidence was insufficient to support any such finding. Second, he argues that the admission of the Fishkill Statement as to that alleged offense without requiring J.D. to testify in person violated Rule 32.1, and thereby deprived him of his rights under the Due Process Clause and the Confrontation Clause. Finally, Peguero challenges the judgment as to

Specification Nine, because the written judgment incorrectly indicates that he committed that specification, contradicting the district court's oral pronouncement.

Additionally, although not raised by Peguero, the dissent contends that the current supervised release revocation framework—specifically, the lesser procedural protections afforded during a revocation proceeding—is unconstitutional.

We address each issue in turn.

## I. Sufficiency of the Evidence

A district court may revoke supervised release and impose a term of imprisonment if the court "finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3853(e)(3). "The preponderance standard requires proof that the defendant's violation of supervision was more likely than not." *United States v. Edwards*, 834 F.3d 180, 199 (2d Cir. 2016) (internal quotation marks omitted). Because the standard of proof for revocation proceedings is lower than at a criminal trial, "a district court may find that a defendant has committed another crime even in the absence of a conviction for that crime." *United States v. Glenn*, 744 F.3d 845, 848 (2d Cir. 2014).

We review the district court's finding of a violation of supervised release "only for abuse of discretion, which can consist of an error of law or a clearly erroneous assessment of the facts." *Edwards*, 834 F.3d at 199; *see United States v. Carlton*, 442 F.3d 802, 810 (2d Cir. 2006).

Specification Four charged Peguero with committing assault in the second degree in violation of New York Penal Law § 120.05(02), which provides that a person is "guilty of assault in the second degree when . . . [w]ith intent to cause physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.05(2). After reviewing the evidence presented, the district court found that Peguero had "punched his girlfriend in the head and about the body while holding a glass bottle in his hand[,]" causing "bruising" and "a laceration to the head for which the victim required medical attention," and that, accordingly, the government had proved by a preponderance of the evidence that Peguero had committed Specification Four. Joint App'x at 131.

Peguero argues that the district court did not find one of the requisite elements of assault—the use of the weapon or instrument to cause the injury—and that, in any event, there was insufficient evidence to support that element. We

disagree. As set forth below, the district court made the requisite finding on that element and did not abuse its discretion in making such a finding based upon the totality of the evidence adduced at the revocation hearing.

In particular, Peguero contends that the district court did "not mak[e] a finding that [Peguero] struck [J.D.] *with the glass bottle* or that the glass bottle caused the physical injury" but that, instead, the district court merely found that "Peguero was *in possession* of an object when he punched [J.D.]." Appellant's Br. at 16 (emphases added). That contention rests upon a strained interpretation of the record that we decline to adopt. Taken in context and read in the most natural way, it is evident that the district court's statement that Peguero "punched [J.D.] . . . while holding a glass bottle in his hand" constituted a finding that Peguero hit J.D. *with* the bottle, not a finding that he hit J.D. with his hand while also, unrelatedly, holding a glass bottle. *See* Joint App'x at 131.

Our reading of the district court's finding is fully supported by the fact that the only direct evidence in the record regarding the bottle came from J.D.'s sworn statement about the attack, in which she stated that Peguero "picked up a glass makeup bottle, held it in his left hand and hit me on the top of the head *with it* causing pain, bleeding" and dizziness "to the point I thought I was going to pass

20

out."[6] Joint App'x at 96 (emphasis added). It is entirely implausible then that the district court made a finding that Peguero was holding the bottle in one hand, while using his other hand to punch J.D., because there is simply no evidence in the record to support that version of events. Moreover, the record reveals that the district court was well aware of the required elements of second-degree assault when it made its finding, as both Peguero's counsel and the government repeatedly emphasized the requirement that a weapon or instrument be used to cause injury. Therefore, we conclude that the district court made the requisite finding that Peguero injured J.D. by striking her with the bottle.

To the extent that Peguero alternatively contends that there was insufficient evidence in the record to support such a finding, that argument is similarly unpersuasive. The evidence presented at the hearing included: (1) a sworn statement from J.D., as noted above, that Peguero "hit [her] on the top of the head" with a glass bottle, causing her injury, Joint App'x at 96; (2) a 911 call in which J.D. informed the dispatcher multiple times that she was bleeding from her head; (3) a photo of the laceration on J.D.'s head; and (4) testimony from the responding police officer that he saw "a laceration" or "abrasion" on J.D.'s head that was

---

[6] J.D.'s statement continued: "After hitting me *with the bottle*, he continued yelling at me and punching me." Joint App'x at 96.

21

"consistent" with her account, Joint App'x at 83. In sum, the totality of the evidence supports the district court's preponderance finding that Peguero "committed a crime of assault 2 . . . [when] he punched his girlfriend in the head and about the body while holding a glass bottle in his hand" and "caused not only bruising on or about the body of the victim . . . , but also caused a laceration to the head for which the victim required medical attention." Joint App'x at 131.

Furthermore, we disagree with Peguero's assertion that the evidence was insufficient to support the district court's finding because it was based in large part on J.D.'s "multiple inconsistent oral and written out of Court statements." Appellant's Br. at 13. Peguero asserts that these statements are inconsistent because J.D. described only being punched and hit in her call to 911 and in her first statement to law enforcement, but then described being punched and hit *with the glass bottle* when she gave her sworn statement the next day (the Fishkill Statement). However, the mere absence of the detail regarding the bottle in the earlier statements does not render the Fishkill Statement inherently contradictory. Moreover, the later statement, as described above, was corroborated by the physical evidence of J.D.'s injury. Thus, it was well within the discretion of the district court to find the Fishkill Statement credible notwithstanding any

22

purported inconsistencies in the record.  *Cf. United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010) ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the [trier of fact].  Where there are conflicts in the testimony, we must defer to the [trier of fact's] resolution of the weight of the evidence and the credibility of the witnesses." (internal quotation marks and alterations omitted)).

Accordingly, we conclude that the district court made the requisite finding regarding the elements of Specification Four and did not abuse its discretion by finding that those elements had been proven by a preponderance of the evidence.

## II.     Admission of the Fishkill Statement under Rule 32.1(b)(2)(c)

Peguero also argues that the district court abused its discretion when it admitted the Fishkill Statement without requiring J.D. to testify at the hearing in violation of Rule 32.1(b)(2)(c), and thereby violated his due process and confrontation rights.  We disagree.

Because revocation hearings are "not deemed part of a criminal prosecution, . . . defendants in such proceedings are not entitled to 'the full panoply of rights' that criminal defendants generally enjoy."  *United States v. Carthen*, 681 F.3d 94, 99 (2d Cir. 2012) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).  However,

"[a]lthough the Confrontation Clause of the Sixth Amendment does not apply to supervised-release revocation hearings," *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006), Federal Rule of Criminal Procedure 32.1 provides that a defendant is entitled "an opportunity to . . . question any adverse witness unless the court determines that the interest of justice does not require the witness to appear[.]" Fed. R. Crim. P. 32.1(b)(2)(c); *see Williams*, 443 F.3d at 45. To determine whether good cause exists, "the court must balance, on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay." *Williams*, 443 F.3d at 45; *see United States v. Chin*, 224 F.3d 121, 124 (2d Cir. 2000). "We review a district court's balancing of the Rule 32.1 factors for abuse of discretion." *Carthen*, 681 F.3d at 100.

Here, the district court engaged in a careful balancing of the relevant factors in making the "good cause" finding under Rule 32.1. The district court explicitly recognized Peguero's strong interest in confronting J.D., noting that her sworn statement was "a comprehensive accounting of the incident made after the fact" and accordingly, that Peguero had a considerable interest in questioning her about her alleged "mistrust, anger, and bias and alleged material omissions." Joint

24

App'x at 181 (internal quotation marks omitted).  However, the district court then balanced Peguero's interest against the statement's high reliability, noting that, not only was the statement "sworn and signed," but that it was also "corroborated in part by [J.D.'s] other admissible statements and [Peguero's] own accounting of the incident."  Joint App'x at 181.  Finally, the district court considered the government's proffered reason for J.D.'s unavailability—that she was "alleged to have suffered seizures after being attacked by [Peguero]" and was "afraid to re-experience those ailments"—and concluded that this reason, in addition to the statement's reliability, weighed in favor of its admission without requiring J.D.'s presence.  Joint App'x at 182.

Although Peguero does not contest that the district court applied the correct Rule 32.1 balancing test, he does dispute how the factors were weighed.  First, Peguero argues that J.D. was not truly unavailable, as she "had been located and could have been produced as a witness."  Appellant's Br. at 22–23.  However, as we have repeatedly held, a witness does not need to be completely unreachable for there to be good cause for the witness not to testify at a revocation hearing.  *See, e.g.*, *United States v. Harris*, 838 F.3d 98, 107–09 (2d Cir. 2016) (holding that good cause existed to not allow confrontation when a locatable witness refused to testify

out of fear of the defendant).  In particular, we have emphasized that "good cause justifying the absence of a declarant exists when a defendant has a history of violent conduct that makes reprisal against the declarant a possibility."  *Carthen*, 681 F.3d at 101 (internal quotation marks and alterations omitted); *see Williams*, 443 F.3d at 45 ("In the balancing process, the defendant's interest in confronting the declarant is entitled to little, if any, weight where the declarant's absence is the result of intimidation by the defendant.").

Here, J.D. informed law enforcement "that she did not want to testify because she had suffered seizures and anxiety from both incidents [of domestic violence] and was afraid of having to relive them and retrigger her medical issues."  Joint App'x at 175.  Peguero contends that J.D.'s statement fails to give rise to good cause not to testify as it only demonstrates that J.D. had "concerns about lingering medical problems," not that she was "fearful of Carlos Peguero." Appellant's Br. at 23.  We disagree.  As outlined above, there was a sufficient basis for the district court to reasonably infer that J.D.'s statement about her refusal to testify indicated an ongoing fear of and intimidation by Peguero that would re-trigger the significant medical issues that she suffered from the alleged domestic violence at issue in the hearing.  No explicit statement of fear is required.  *See also*

26

*United States v. Alvear*, 959 F.3d 185, 190 (5th Cir. 2020) ("We've previously said that we deem it unnecessary to remand to [the district] court for it to make explicit that which is already implicit. In other words, inferential conclusions from the testimony and the documentary evidence are sufficient to evaluate and *find* good cause." (internal quotation marks and citation omitted)).

We have previously noted that a "desire not to testify [is] not an unusual reaction by a victim of domestic abuse." *Carthen*, 681 F.3d at 101; *see also United States v. Hall*, 419 F.3d 980, 988 n.6 (9th Cir. 2005) (emphasizing that "[t]he difficulty of securing the testimony of domestic violence victims . . . against their batterers is well recognized"). Given Peguero's history of domestic violence in general, and against J.D. specifically, it was reasonable for the district court to conclude that J.D. faced a realistic possibility of reprisal if she testified. *See United States v. Jones*, 299 F.3d 103, 113 (2d Cir. 2002) (upholding a district court's finding of good cause to not have a victim of domestic assault testify when the defendant's "history of violent conduct made reprisal against [the victim] a possibility"). In any event, even assuming, *arguendo*, that there is no ongoing fear of retaliation, Rule 32.1 is flexible enough to consider a victim's refusal to appear at the hearing because of the potential re-triggering of significant medical issues from testifying about the

alleged domestic violence as a basis for "good cause" to allow the victim's hearsay statement, if that reason is properly balanced against the other applicable factors. *See generally Morrissey*, 408 U.S. at 489 (explaining that revocation proceedings are "flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial").

Peguero also argues that J.D.'s sworn statement was "inherently unreliable, as it was inconsistent with [her] other admitted written and oral statements." Appellant's Br. at 24. This argument likewise fails. As we have already discussed, J.D.'s sworn statement was corroborated by her other statements, both on 911 calls and to law enforcement immediately after the incidents of domestic violence, as well as by her physical injuries and Peguero's own account of the incident on his call from jail. Therefore, the district court reasonably determined that the sworn statement was sufficiently reliable to be admitted. *See Carthen*, 681 F.3d at 100 (holding that out-of-court statements were reliable as they were "corroborated by other evidence" and "detailed, credible, and sometimes under oath").

Accordingly, based upon this record, we find that the district court did not abuse its discretion in concluding, on balance, that the reasons for admitting the hearsay statement outweighed Peguero's right to confront the complaining

28

witness as to these alleged incidents of domestic violence, and that "good cause" had thus been shown under Rule 32.1(b)(1)(c) for the admission of that hearsay statement.

## III. The Constitutionality of Supervised Release Revocation Proceedings

Although the issue was neither raised nor briefed by either party, the dissent asserts that Section 3583(e)(3), which allows a judge to revoke supervised release based upon a finding of new criminal conduct, is unconstitutional. *See post* at 1–2. In particular, the dissent contends that a revocation hearing based on new conduct punishable by more than one year in prison violates a defendant's right to indictment, right to confront witnesses, right to a jury trial, and right to remain free unless proven guilty beyond a reasonable doubt. *See post* at 5–9. In support of this proposition, the dissent relies upon the "essential differences" between terms of probation or parole—which the dissent contends do not require such constitutional protections—and supervised release. *Post* at 2. We respectfully disagree.

As an initial matter, the dissent's proposed holding is contrary to our well-settled precedent, from which this panel is not free to deviate. In addition to the requirement that we adhere to binding precedent, we conclude that the dissent's

approach is unsupported by the Constitution itself in light of the clear and direct connection between a supervised release term (and its accompanying conditions) and the original conviction and sentence. Moreover, we are unpersuaded by the dissent's contention that there are distinctive characteristics of a supervised release revocation proceeding, as compared to parole and probation, that would justify the differing constitutional protections the dissent proposes. Finally, we believe that the dissent's proposed rule would have a drastic and devastating impact on the effective functioning of the criminal justice system.

## A. Circuit Precedent

It is well-established in our Circuit that the supervised release revocation process, and its attendant procedural mechanisms, is constitutional.[7] *See, e.g.,* *United States v. Diaz*, 986 F.3d 202, 208–09 (2d Cir. 2021); *United States v. Doka*, 955 F.3d 290, 293 (2d Cir. 2020); *Carthen*, 681 F.3d at 99–100; *Carlton*, 442 F.3d at 807–10; *United States v. McNeil*, 415 F.3d 273, 276–77 (2d Cir. 2005); *United States v. Meeks*, 25 F.3d 1117, 1123 (2d Cir. 1994), *abrogated on other grounds by Johnson v. United States*, 529 U.S. 694 (2000). As we noted above, revocation proceedings "are not deemed part of a criminal prosecution" and, as such, "defendants in such

---

[7] Moreover, at the time of filing, we are not aware of any decisions by our sister Circuits to the contrary.

30

proceedings are not entitled to 'the full panoply of rights' that criminal defendants generally enjoy." *Carthen*, 681 F.3d at 99 (quoting *Morrissey*, 408 U.S. at 480); *see Diaz*, 986 F.3d at 208 ("[A] revocation proceeding cannot be equated with a criminal prosecution in any sense. Because the defendant already stands convicted of a crime, the government is not put to the burden of an adversarial criminal trial." (internal quotation marks and citation omitted)).

Accordingly, we have repeatedly held that certain constitutional protections, such as the right to a grand jury indictment for a felony offense, the right to hold the government to a burden of proof beyond a reasonable doubt, the right to confront adverse witnesses, and the right to a jury trial, do not attach to supervised release hearings in the same way that they do to criminal prosecutions. *See, e.g., Diaz*, 986 F.3d at 209 (noting that "[n]either the Federal Rules of Evidence nor the Sixth Amendment's Confrontation Clause apply with full force in a revocation proceeding"); *Carthen*, 681 F.3d at 99–100 (noting that, at a revocation hearing, "the alleged violation of supervised[] release need only be proven by a preponderance of the evidence, not beyond a reasonable doubt"); *Carlton*, 442 F.3d at 809 ("[I]t is evident that the constitutional rights afforded a defendant subject to revocation of supervised release for violation of its conditions are not co-extensive

with those enjoyed by a suspect to whom the presumption of innocence attaches."); *McNeil*, 415 F.3d at 277 ("[A] violation of supervised release is not a separate basis for criminal punishment that requires a jury verdict and all that that entails."); *Meeks*, 25 F.3d at 1122 ("[T]hese fundamental constitutional protections do not apply . . . because a revocation proceeding is not a proceeding designed to punish a criminal defendant for violation of a criminal law." (internal quotation marks omitted)).[8]

Given the inarguable clarity and weight of this caselaw, the dissent acknowledges that our holding is "supported by precedent." *Post* at 33. However, the precedent outlined above is not mere support for our position—it is binding authority from which we cannot deviate. It is a longstanding rule that a panel of our Court is "bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). Accordingly, it is "neither appropriate nor possible" for us to reject our prior decisions upholding

---

[8] Although we have not explicitly addressed the right to indictment in this context, by holding that a revocation proceeding is not a criminal prosecution, our precedent definitively forecloses any assertion that the right to indictment attaches to a revocation proceeding.

the constitutionality of supervised release. *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 67 (2d Cir. 2009).

To be sure, there is an exception to this general rule. If "an intervening Supreme Court decision casts doubt on the prior ruling"—that is, where "the Supreme Court's conclusion in a particular case . . . broke[] the link on which we premised our prior decision, or undermined an assumption of that decision,"—then we are not bound by our prior ruling.[9] *Dale v. Barr*, 967 F.3d 133, 142–43 (2d Cir. 2020) (internal quotation marks omitted). "[W]e resort to this exception cautiously," however, as a "less-than-stringent application of the standards for overruling prior decisions not only calls into question a panel's respect for its predecessors but also increases uncertainty in the law by revisiting precedent without cause." *Id.* at 143 (internal quotation marks omitted).

The dissent does not claim that any intervening Supreme Court decision has cast doubt upon our precedent. In particular, although the dissent heavily relies

---

[9] Additionally, a three-judge panel may overrule Circuit precedent if it first follows a "mini-*en banc*" procedure—*i.e.*, if "the panel circulates its opinion among all active judges and receives no objections to its filing." *Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 378 (2d Cir. 2016), *abrogated on other grounds by Badgerow v. Walters*, 142 S. Ct. 1310 (2022). This exception is not implicated here.

upon the Supreme Court's opinion in *United States v. Haymond*,[10] 139 S. Ct. 2369 (2019), to support its analysis, the dissent does not suggest that *Haymond* overruled our binding precedent and required the additional constitutional protections in a supervised release revocation proceeding the dissent now proposes. Nor could any such argument be made from *Haymond*. First, *Haymond* concerned the constitutionality of 18 U.S.C. § 3583(k), a provision not at issue here. *See id.* at 2374–75. Section 3583(k) imposed a mandatory sentencing enhancement, without regard to the original prison term, if a judge found that a defendant on supervised release who was also required to register as a sex offender "committed one of several enumerated offenses." *Id.* at 2374 (plurality opinion). The Court declared that provision unconstitutional,[11] *id.* at 2386 (Breyer, J., concurring), but

---

[10] *See post* at 8, 12–13, 16, 18, 24, 30, 32 (citing to Justice Gorsuch's plurality opinion).

[11] The Court in *Haymond* did not articulate a consistent rationale as to why the provision was unconstitutional. The plurality opinion, authored by Justice Gorsuch and joined by Justices Ginsburg, Sotomayor, and Kagan declared that, because Section 3583(k) increased the range of allowable sentences based on facts found by a judge by a preponderance of the evidence, the provision was unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013), which require that a fact increasing a mandatory minimum sentence must be found by a jury by proof beyond a reasonable doubt. *Haymond*, 139 S. Ct. at 2377–78 (plurality opinion) (citing *Apprendi* and *Alleyne*). Justice Breyer concurred separately, agreeing with the plurality that Section 3583(k) was unconstitutional, but also agreeing with the dissent (authored by Justice Alito) that the *Apprendi* line of cases should not apply to the "supervised-release context." *Id.* at 2385–86 (Breyer, J., concurring). Instead, Justice Breyer concluded that the provision was unsupportable due to three problematic features that, when "[t]aken together, . . . more closely resemble the punishment of new criminal offenses, but without

34

specifically left untouched the general revocation provision at issue here, Section

3583(e)(3), *see id.* at 2383 (plurality opinion) (noting that "what agitates the dissent

so much is an issue not presented here: whether *all* supervised release

proceedings" are unconstitutional). Second, a prior panel of this Circuit has

already directly addressed *Haymond*'s effect and concluded decisively that the

decision "did not undermine, let alone overrule, our precedent on the validity of

[Section] 3583(e) . . . ."[12] *Doka*, 955 F.3d at 292; *see id*. at 296–99. Every sister Circuit

that has considered the issue thus far has reached the same conclusion.[13]

---

granting the defendant the rights . . . that attend a new criminal prosecution": namely, that the provision (1) only applied "when a defendant commits a discrete set of federal criminal offenses specified in the statute;" (2) took away the judge's discretion to determine if, and for how long, incarceration was warranted; and (3) imposed a "mandatory minimum term of imprisonment," thus "limit[ing] the judge's discretion in a particular manner." *Id.* at 2386. As we concluded in *Doka*, Justice Breyer's concurrence "represent[ed] the narrowest ground supporting the judgment, and therefore provides the controlling rule." *See Doka*, 955 F.3d at 296 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

[12] The *Doka* panel applied the controlling rule in *Haymond¸* as set forth in Justice Breyer's concurrence, and concluded that "[Section] 3583(e)(3) does not present any of the three factors that, in combination, render [Section] 3583(k) unconstitutional," as the provision "does not apply to a discrete set of offenses; eliminate the sentencing judge's discretion in revocation proceedings; or impose a mandatory minimum term of imprisonment for the violation of a condition of supervised release." 955 F.3d at 298–99.

[13] *See, e.g., United States v. Moore*, 22 F.4th 1258, 1268–69 (11th Cir. 2022); *United States v. Childs*, 17 F.4th 790, 792 (8th Cir. 2021); *United States v. Henderson*, 998 F.3d 1071, 1072 (9th Cir. 2021); *United States v. Salazar*, 987 F.3d 1248, 1261 (10th Cir. 2021); *United States v. Seighman*, 966 F.3d 237, 244 (3d Cir. 2020); *United States v. Ka*, 982 F.3d 219, 222 (4th Cir. 2020); *United States v. Smithey*, 790 F. App'x 643, 644 (5th Cir. 2020) (per curiam).

Accordingly, as there is no intervening opinion undermining our prior decisions that upheld the constitutionality of Section 3583(e)(3), it is "neither appropriate nor possible" for us to reject our well-established precedent. *Shipping Corp. of India*, 585 F.3d at 67.

**B.      Supervised Release Revocation Proceedings Do Not Require the Constitutional Protections of a Criminal Prosecution**

Notwithstanding the above, even if we were able to reexamine the constitutionality of supervised release, we disagree with the dissent's contention that a revocation of supervised release for conduct punishable by more than one year in prison constitutes a criminal prosecution without affording the proper constitutional protections. *See post* at 1–2. Instead, the jurisprudence of both the United States Supreme Court and our Court have thoroughly examined the legal principles supporting the constitutionality of the current revocation system and, in our view, the dissent's analysis fails to undermine that reasoning.

Because "[s]upervised release is imposed as part of the original sentence," it "is authorized by the original conviction, and so too are the consequences of its violation." *McNeil*, 415 F.3d at 277; *see Doka*, 955 F.3d at 294 (quoting *McNeil*). Therefore, at the time of the sentencing on the underlying criminal offense, the maximum term of imprisonment that the defendant can face for that conviction is

the maximum term of imprisonment for the underlying crime *plus* the maximum term of his supervised release authorized by statute for the underlying offense, if he violates any conditions of release. For instance, if a defendant is convicted of bank fraud under 18 U.S.C. § 1344, a class B felony, the maximum term of imprisonment authorized for that conviction is up to thirty years' imprisonment for the underlying offense *plus* an additional three years' imprisonment if the defendant violates the conditions of his supervised release. *See* 18 U.S.C. § 3583(e)(3) (limiting the revocation term to no more than three years' imprisonment "if the offense that resulted in the term of supervised release is a . . . class B felony").

As a component of the initial sentence, "[s]upervised release is a form of postconfinement monitoring that permits a defendant a kind of conditional liberty by allowing him to serve part of his sentence outside of prison." *Mont v. United States*, 139 S. Ct. 1826, 1833 (2019) (internal quotation marks omitted). Indeed, "the very purpose of a supervised release revocation hearing is to determine the gravity of the breach of trust committed by the defendant in the context of the 'conditional liberty' [he] was granted following [his] conviction of the underlying offenses." *United States v. Ramos*, 979 F.3d 994, 1001 (2d Cir. 2020) (internal quotation marks

omitted).  It is within this framework that we have soundly concluded that "[r]evocation proceedings are not deemed part of a criminal prosecution and, therefore, defendants in such proceedings are not entitled to the full panoply of rights that criminal defendants generally enjoy."  *Carthen*, 681 F.3d at 99 (internal quotation marks omitted).  In doing so, we have emphasized that "[t]his Court considers the constitutional protections for revocation of supervised release to be the same as those afforded for revocation of parole or probation." *United States v. Ramos*, 401 F.3d 111, 115 (2d Cir. 2005) (internal quotation marks omitted).

We find the dissent's effort to distinguish supervised release from either parole or probation, for purposes of determining the requisite constitutional protections for revocation, to be unpersuasive.  To be sure, there are differences between these three systems of supervision.  For example, as opposed to parole, a supervised release term "does not replace a portion of the sentence of imprisonment, but rather is an order of supervision *in addition to* any term of imprisonment imposed by the court."  U.S. SENT'G GUIDELINES MANUAL, Ch. 7, pt. A, intro. (2)(b) (U.S. SENT'G COMM'N 2021) (emphasis added).  Although these differences exist, it goes too far to argue, as the dissent appears to suggest, that because a term of supervised release is distinct from the original *term of*

38

*incarceration*, it must also be distinct from the original *sentence*.  *See post* at 12–18.

This distinction, its own form of "[s]emantic gymnastics," *post* at 4, improperly

conflates the original term of incarceration with the original sentence.  As noted

above, precedent and logic make clear that a term of supervised release is imposed

as part and parcel of the original sentence—an inextricable "part of the penalty for

the initial offense." *Johnson*, 529 U.S. at 700–01; *see McNeil*, 415 F.3d at 277 (quoting

*Johnson*).  In other words, because the requirement that a defendant abide by the

conditions of supervised release flows directly from the original sentence,

revoking a term of supervised release for violating such conditions is not a new

criminal prosecution.  *See Johnson*, 529 U.S. at 701 (holding that "postrevocation

penalties relate to the original offense").  Instead, like a revocation of probation or

parole, it merely completes the original sentence imposed.[14]  *See Haymond*, 139 S.

Ct. at 2391 (Alito, J., dissenting) ("When a jury finds a federal defendant guilty of

violating a particular criminal statute, the maximum period of confinement

authorized is the maximum term of imprisonment plus the maximum term of

---

[14]  This understanding of supervised release is bolstered by the statute itself, which limits the length of the revocation sanction by the severity of the *original* offense, not by the severity of the new conduct that resulted in revocation.  *See* 18 U.S.C. § 3583(e)(3) ("[A] defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, [no] more than 3 years in prison if such offense is a class B felony, [no] more than 2 years in prison if such offense is a class C or D felony, or [no] more than one year in any other case.").

supervised release.  If a prisoner does not end up spending this full period in confinement, that is because service of part of the period is excused due to satisfactory conduct during the period of supervised release.").

Moreover, even though "supervised release fulfills rehabilitative ends, distinct from those served by incarceration," *United States v. Johnson*, 529 U.S. 53, 59 (2000), it is still, like probation or parole, a grant of leniency based on a defendant's promise to follow certain conditions, *see Mont*, 139 S. Ct. at 1833; *cf. Morrissey*, 408 U.S. at 477.  A defendant's ability to follow those conditions reflects the trust placed in him by the sentencing court—essentially, the defendant promises he is "able to return to society and function as a responsible, self-reliant person." *Morrissey*, 408 U.S. at 482.  Thus, as noted above, any sanctions resulting from violations of supervised release conditions, even if based on new criminal conduct, "are first and foremost considered sanctions for the defendant's 'breach of trust[,]' . . . not 'for the particular conduct triggering the revocation as if that conduct were being sentenced as *new* federal criminal conduct.'"[15] *Haymond*, 139

---

[15] It is notable that the Sentencing Commission explicitly considered and rejected the approach of treating supervised release violations as new criminal conduct, instead concluding that "at revocation the court should sanction primarily the defendant's breach of trust."  U.S. SENT'G GUIDELINES MANUAL, Ch. 7, pt. A, intro. 3(b).  After extensive debate, the Commission noted that treating such violations as a new criminal offense was impractical, as "it would be difficult in many instances for the court or the parties to obtain the information necessary to apply properly

S. Ct. at 2386 (Breyer, J., concurring) (quoting U.S. SENT'G GUIDELINES MANUAL Ch. 1, pt. A, intro. 3(b) (emphasis added)); *see also id.* at 2393 (Alito, J., dissenting) ("The principal reason for assigning a penalty to a supervised-release violation is not that the violative act is a crime (indeed, under other provisions in [Section] 3583, the act need not even be criminal); rather, it is that the violative act is a breach of trust."). In addition, despite the dissent's argument to the contrary, *see post* at 24–25, this approach is fully consistent with supervised release's rehabilitative goals, as it does not focus on punishing new conduct, but instead, on sanctioning the individual for failure to abide by the conditions of his new, law-abiding life, *see* U.S. SENT'G GUIDELINES MANUAL, Ch. 1, pt. A, intro. 3(b).

With this understanding in mind, it is abundantly clear why supervised release revocation proceedings are, in fact, constitutionally distinguishable from new criminal prosecutions and, thus, why the "full panoply" of constitutional rights does not attach to a supervised release revocation, just as it does not attach to a revocation of parole or probation. *See Haymond*, 139 S. Ct. at 2393 (Alito, J.,

---

the guidelines to this new conduct" and could raise concerns about the accuracy of factual findings. *Id.* Moreover, the Commission concluded that this alternate approach was "inconsistent with its views that the court with jurisdiction over the criminal conduct leading to revocation is the more appropriate body to impose punishment for that new criminal conduct." *Id; see also United States v. Verkhoglyad*, 516 F.3d 122, 130 n.6 (2d Cir. 2008) (discussing the Commission's approach).

dissenting) ("[I]t makes little sense to treat [a defendant] as the accused . . . when he has been charged not with a crime, but with violating the terms of a jury-authorized sentence that flowed from his original conviction."). Although the dissent decries this approach as a "legal fiction" and a "constitutional workaround," *post* at 3, 18, it is, in fact, far more straightforward. We reemphasize that the additional constitutional protections outlined by the dissent are unnecessary because revocation of supervised release is not a new criminal prosecution—it is simply an additional sanction authorized by the original sentence based upon the releasee's breach of trust by violating the terms of his conditional release. Indeed, the dissent describes the purposes of probation in almost precisely the same terms. *See post* at 13 (explaining that, with respect to probation, "[l]eniency is granted in exchange for a defendant's promise to comply with certain conditions; failure to do so at least arguably breaches the 'trust' placed in the defendant by the sentencing judge").[16]

---

[16] The similarity in the objectives of sentencing an individual for his violation of supervised release, as compared to sentencing him for a violation of probation, is further demonstrated by the fact that the policy statements in Chapter 7 of the Sentencing Guidelines treat such violations in *identical terms* in determining the advisory Guidelines range. *See* U.S. SENT'G GUIDELINES MANUAL § 7B1.1 (listing one set of violation classifications and advisory ranges for both probation and supervised release violations).

Because probation and supervised release are both forms of conditional liberty for which sanctions for breach of that trust are authorized by the original sentence, the dissent's effort to distinguish the two for purposes of constitutional protections in a revocation proceeding would lead to probationers and supervised releasees being conferred with vastly different constitutional rights, even though they were originally sentenced for the exact same underlying offense and are alleged to have violated their conditions of release in an identical manner.

For example, assume that two defendants are convicted of bank fraud under 18 U.S.C. § 1344. Defendant #1 is sentenced to three years of probation for the offense. During the last year of his three-year term of probation, he is alleged to have engaged in new criminal conduct by committing the state offense of larceny for stealing $5,000 from his employer. Under the dissent's approach, Defendant #1's probation can be revoked and a term of imprisonment can be imposed up to the maximum of the original crime (*i.e.*, thirty years for bank fraud) under the existing statutory framework—that is, based upon a judicial finding after a hearing under a preponderance of the evidence standard—without any of the constitutional protections afforded to an individual charged in a criminal prosecution. In contrast, assume Defendant #2 in the same federal case is

43

convicted of the exact same underlying bank fraud, but had already served one day in jail before he was released on bail after his arrest. Thus, he is sentenced to time served (a sentence of one day) with three years of supervised release to follow (instead of three years of probation). Assume further that Defendant #2, while on supervised release, engaged in new criminal conduct punishable by over a year's imprisonment in his last year of supervision by committing the state offense of larceny for stealing $5,000 from his employer, which is identical in every respect to the offense committed by Defendant #1 while on probation. Under the dissent's approach, unlike his co-defendant on probation, Defendant #2's supervised release can be revoked and a term of imprisonment up to the maximum term of supervised release for the original crime (*i.e.*, five years for bank fraud) imposed only if he is indicted, receives a full jury trial, and the government proves his guilt to the jury beyond a reasonable doubt. These types of anomalies would be commonplace because the revocation regime proposed by the dissent is inconsistent with the common fundamental underpinnings of probation and supervised release as alternative components of the original sentence that condition liberty on compliance with release conditions.

Furthermore, the dissent attempts to limit its holding to revocation proceedings only involving allegations of new conduct punishable by over a year's imprisonment. That limitation, however, has little practical effect on the broad category of violations that would qualify for full constitutional protections, including the right to indictment and the right to a jury trial. Specifically, if the underlying offense of conviction was a Class D felony or higher (which, in practice, would include the overwhelming majority of underlying offenses), a supervised releasee could receive a maximum sentence of up to two years' imprisonment upon revocation for *any* violation, whether criminal or not. *See* 28 U.S.C. § 3583(e)(3). For example, non-criminal violations (classified as a "Grade C" violation under the Guidelines)—such as failing a drug test, failing to update an address with the Probation Department upon moving, failing to attend a treatment program, failing to pay restitution as ordered in a special condition, and other similar violations—all expose the releasee to up to two years' imprisonment, even though the sentence is likely to be much lower. Therefore, in each of these situations, the government would be required to indict the supervised releasee and convict him before a jury beyond a reasonable doubt before a district court could revoke his supervised release term and impose any sentence.

Although it is not relevant to the constitutionality of the supervised release regime, the dissent's approach would likely also have far-reaching, "potentially destabilizing consequences" to the federal criminal justice system. *Haymond*, 139 S. Ct. at 2385 (Breyer, J., concurring). Between 2013 and 2017, an average of 21,600 supervised release violations a year were reported in the federal system. U.S. SENT'G COMM'N, FED. PROB. AND SUPERVISED RELEASE VIOLATIONS 14 (July 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200728_Violations.pdf. An overwhelming majority of those violations (approximately 93.4%, or 20,147) resulted in terms of imprisonment following a revocation hearing. *Id.* at 27. Moreover, regardless of the ultimate sentence, nearly all of these violations would subject the releasee to a potential sentence of more than one year's imprisonment (as discussed *supra*) and, thus, trigger the dissent's additional constitutional protections. Requiring that each of these violations be adjudicated as a full criminal proceeding—with all the resources that entails—would dramatically increase the existing burden on the federal system.

Even if the dissent's approach were limited to revocations based on new *criminal* conduct punishable by over a year's imprisonment—thus eliminating the

46

other non-criminal violations discussed above (Grade C under the Guidelines)—the impact is still substantial. In the time period cited above, 45.1% of supervised release violations—or an average of 9,741 violations per year—qualified as either Grade A (violent, firearms, or drug offenses punishable by more than one year of imprisonment, and all other offenses punishable by more than 20 years of imprisonment) or as Grade B (offenses punishable by more than one year of imprisonment).[17] FED. PROB. AND SUPERVISED RELEASE VIOLATIONS, at 31. We recognize that this statistic does not take into account the fact that defendants are often charged with multiple violations in the same revocation proceeding and thus, separate trials would not be necessary for each violation. However, even considering that limitation in the statistics, we can safely state that the dissent's approach (with its full panoply of constitutional protections) would apply to hundreds and hundreds of revocation proceedings annually.

Further, to the extent one might argue that only a small percentage of such violations would proceed to trial, that assumption is likely misplaced. Where, as

---

[17] We cite primarily to the above report (reflecting data from 2013–2017) given its comprehensive analysis along various metrics. Data from the Administrative Office of the U.S. Courts for 2018 to 2021 reflects a lower overall number of supervised release violations for new criminal offenses resulting in revocation, although this amount is still substantial. *See* Admin. Office of U.S. Courts, Judicial Business of the United States Courts (2018–2021) (Tables E-7A) (reporting an average of 15,167 revocations of supervised release a year for 2018–2021, with an average of approximately 4,659 violations, or approximately 31%, defined as revocations for new criminal offenses).

here, the alleged new criminal conduct did not result in a state conviction, supervised releasees may hesitate to plead guilty because of a belief (perhaps well-founded) that the prosecutor may choose not to even pursue a violation involving alleged new criminal conduct if he or she would need to expend the time and resources to present the evidence of such violation in a grand jury proceeding and then a jury trial. That belief may be magnified in situations where proving the new criminal conduct (or proving a non-criminal Grade C violation) in such proceedings would likely only result in a relatively short term of imprisonment if supervised release were revoked. At a minimum, supervised releasees may often make the government present the case to the grand jury before making any plea decisions, thus potentially requiring additional hundreds of grand jury presentations annually that could overwhelm prosecutors and the grand jury system. Moreover, even assuming that the guilty plea rate remained the same for supervised release violations within the dissent's new framework under the current system—that is, approximately 81.9%, *see* FED. PROB. AND SUPERVISED RELEASE VIOLATIONS, at 30—that would potentially result in several hundred additional jury trials each year that would need to be conducted in district courts for supervised release violations. That additional volume would significantly

48

burden the district courts across the nation, many of which already face a substantial backlog of trial-ready cases, and potentially affect the ability of defendants in the non-supervised release context to obtain a speedy trial. Of course, if the Constitution required what the dissent suggests, we would need to adopt additional constitutional protections for supervised release revocations, regardless of the burden it may place on the federal judiciary. But fortunately, we need not face the significant practical implications of the dissent's approach because of our binding and well-reasoned precedents.

~*~*~*~*~*~

In sum, for the reasons set above and in our well-settled, binding precedent, we again hold that Section 3583(e)(3) is constitutional.

## IV.    Clerical Error in Judgment

Finally, Peguero challenges the inclusion of Specification Nine in his judgment as a proven violation, as the district court orally pronounced that the government had failed to prove that violation by a preponderance of the evidence. The government concedes that this was a clerical error and also seeks a limited remand on Specification Nine to permit the district court to enter an amended judgment. We agree that remand is appropriate here.

We have consistently held that "where an unambiguous oral sentence conflicts with the written judgment, the constitutional right of a defendant to be present at sentencing dictates that the oral pronouncement of sentence must control." *United States v. Jacques*, 321 F.3d 255, 263 (2d Cir. 2003) (internal quotation marks and alteration omitted); *United States v. Carr*, 557 F.3d 93, 109 (2d Cir. 2009). "When such a conflict exists, the proper remedy is to remand for amendment of the written judgment." *Jacques*, 321 F.3d at 263; *accord United States v. Marquez*, 506 F.2d 620, 622–23 (2d Cir. 1974).

The district court's written judgment, issued on November 4, 2020, indicated that Peguero had committed Specification Nine by disobeying a court order of protection. However, at the October 8, 2020 revocation hearing, the district court orally announced its finding "that the government failed to demonstrate by a preponderance of the evidence that Carlos Peguero committed [Specification 9]" as the government had "fail[ed] to introduce the order of protection . . . or present evidence that there was in fact an order of protection in effect on the date of the incident." Joint App'x at 132–33. Similarly, the transcript of Peguero's sentencing also clearly demonstrates that he was not sentenced based upon Specification Nine, which the government had failed to prove. Because

there is a clear discrepancy between the written judgment and the oral pronouncement, we conclude that the oral pronouncement controls and remand for the limited purpose of amending the judgment to remove Specification Nine from the list of Peguero's violations and, instead, to include Specification Nine on the list of specifications that Peguero did not violate. *Jacques*, 321 F.3d at 263.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** Peguero's judgment of revocation except as to Specification Nine and **VACATE in part** Peguero's judgment of revocation and **REMAND** for amendment of the judgment as to Specification Nine.

Stefan R. Underhill, *District Judge*, dissenting:

Carlos Peguero was sentenced to twenty-eight months in federal prison for criminal conduct proscribed by the State of New York. Peguero was not federally indicted for the felony crime of assault, was denied the right to confront witnesses against him, was never advised of his right to a jury trial, and was found "guilty" by a preponderance of the evidence. In short, Peguero was imprisoned without being afforded any of the fundamental Constitutional rights that protect citizens from arbitrary imprisonment by the government.

I acknowledge that the district court acted consistently with existing precedent of this Court, and that the majority feels constrained to follow that precedent and to affirm. Importantly, however, no decision of the Supreme Court or this Court has ever analyzed whether a person on supervised release facing violation charges punishable by more than one year in prison has a right to indictment on those charges. Nor has either Court ever held that proceedings that require indictment do not constitute a "prosecution" and therefore can be decided without affording the accused his Sixth Amendment rights. Because this appeal raises Confrontation Clause issues, and because I conclude that Peguero had the right to be indicted for his claimed supervised release violations, I further conclude that he had the right to confront witnesses against him. In my view, prior

decisions allowing a judge to sentence a person to prison for more than a year based on a violation of supervised release without providing such essential Constitutional protections are misguided and based on unsupportable legal fictions. Accordingly, I respectfully dissent.

## I.     Introduction

The majority relies upon decisions that treat a violation of supervised release exactly like a violation of parole or probation. Those decisions ignore essential differences between supervised release on the one hand and parole and probation on the other. A person released on parole who commits new criminal conduct while on parole will be returned to prison to serve the remainder of the sentence imposed on the *original conviction* for the *original criminal conduct*—for which he was indicted and was provided the other rights guaranteed by the Constitution. A person sentenced to probation who commits new criminal conduct while on probation can be sent to prison after being resentenced on the *original conviction* for the *original criminal conduct*—for which he was indicted and was provided the other rights guaranteed by the Constitution. A person serving a term of supervised release, following completion of a prison sentence, who allegedly violates a condition of supervised release punishable by more than one

2

year in prison has a right to be indicted before having a new prison term imposed. Unlike parolees and probationers, he is *not* being resentenced or imprisoned based upon the *criminal conduct for which he was already indicted, convicted, and punished*.

Caselaw employs the legal fiction that, because a term of supervised release is imposed as part of the sentence on the original criminal conduct, any punishment imposed for violating a condition of supervised release is simply adding to the sentence for the original criminal conduct. Relying on precedent developed in the context of parole, those decisions hold that a supervised release violation proceeding does not constitute a "prosecution" to which the Sixth Amendment right to confront government witnesses — or other Fifth and Sixth Amendment rights — would attach.

The legal fiction collapses when one considers the implications of the right to indictment. The Fifth Amendment right to indictment constitutes, in essence, the right to be formally prosecuted for any conduct that could result in a term of imprisonment greater than one year. The original indictment cannot have anticipated and included conduct occurring years in the future. Therefore, unless a supervisee is indicted for the new conduct giving rise to the prospect of imprisonment, he has been denied his right to indictment. In any proceeding at

which the government attempts to prove indicted conduct, of course, the defendant enjoys the full panoply of Sixth Amendment rights.

More practically, whatever label might be attached or whatever it might be "deemed," a supervised release violation proceeding constitutes a prosecution within the meaning of the Sixth Amendment. Semantic gymnastics cannot change the fact that, in a supervised release violation proceeding, (1) the government (2) accuses the defendant (3) of violating a condition of supervised release and, (4) if that charge is proven, the defendant will be sentenced to a new term of imprisonment. That is the paradigm of a prosecution to which the rights protected by the Fifth and Sixth Amendments attach.

In the present case, following indictment, Peguero pled guilty to bank robbery (not domestic assault) in 2007. He was sentenced to more than eight years in prison followed by a five-year term of supervised release. Peguero's initial term of supervised release began on December 27, 2013. In 2019, more than twelve years after his original conviction (and after two separate supervised release revocations, one of which included additional time in prison), Peguero was arrested for felony assault in violation of New York penal law. Peguero was charged with the crime, but then a complication arose: the alleged victim declined

4

to testify. Without that witness, the state prosecutor determined, there was simply not enough evidence to prove Peguero guilty beyond a reasonable doubt. The charges were dismissed, and later expunged from Peguero's record.

That turn of events only made things worse for Peguero—his case was picked up by federal authorities as a violation of the conditions of his supervised release. The consequence of the move to federal court was to deny Peguero his right to indictment, his right to confront witnesses, his right to a jury trial, and his right to remain free of imprisonment unless proven guilty beyond a reasonable doubt —all of which he was constitutionally required to receive in state court. Peguero challenged the proceedings as violative of the Confrontation Clause of the Sixth Amendment in the district court. He now renews that challenge on appeal.

Peguero was sent to prison by the federal court in violation of his fundamental constitutional rights. Those same violations occur in federal court supervised release proceedings across the country every day. It is time for the courts to acknowledge that injustice and bring supervised release proceedings into line with the Constitution.

## II.    The Constitution

The "most elemental of liberty interests [is] the interest in being free from physical detention by one's own government."  *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *see also Ex parte Mitsuye Endo*, 323 U.S. 283, 299 (1944) (discussing the constitutional safeguards surrounding "arrest, detention and conviction of individuals");  Akhil Reed Amar, *Sixth Amendment First Principles*, 84 Geo. L. J. 641, 660 (1996).   On that premise, the framers crafted a Constitution that makes securing a criminal conviction a difficult task.  *Herrera v. Collins*, 506 U.S. 390, 398-99 (1993).  Consider the safeguards that attach when the government seeks to take a person's liberty through imprisonment.

First, indictment.  The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury. . . ."  U.S. Const. amend. V.  "[A]n infamous crime within the meaning of the [Fifth] Amendment is one punishable by imprisonment in a penitentiary," that is, a crime "subject to imprisonment exceeding one year, 18 U.S.C. § 4083."  *Green v. United States*, 356 U.S. 165, 183 (1958).  If a defendant faces a potential penalty of more than one year of imprisonment, the government must convene a grand jury and persuade the members of that jury that there is probable

cause to believe a crime has been committed. *See* Fed. R. Crim. P. 7(a)(1)(b) ("[a]n offense (other than criminal contempt) must be prosecuted by an indictment if it is punishable . . . by imprisonment for more than one year"); *Kaley v. United States*, 571 U.S. 320, 328 (2014) (explaining that "an indictment fair upon its face, and returned by a properly constituted grand jury . . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged") (cleaned up).

The grand jury requirement guards against "an open and public accusation of crime, and from the trouble, expense, and anxiety of a public trial, before [] probable cause is established." *Hurtado v. California*, 110 U.S. 516, 551-52 (1884) (Harlan, J., dissenting) (cleaned up); *see also* 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1785 (5th ed. 1994) ("[T]he grand jury perform [the] most important public functions, and are a great security to the citizens against vindictive prosecutions, either by the government, or by political partisans, or by private enemies.").

Next, the right to trial by jury. Those who wrote our Constitution considered the right to be tried by an impartial jury essential to "prevent oppression by the Government." *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968); *see*

*also id.* at 155 n.23 ("[T]rial by jury is more than an instrument of justice and more than one wheel of the constitution: it is the lamp that shows that freedom lives.") (quoting P. Devlin, Trial by Jury 164 (1956)); *United States v. Haymond*, 139 S. Ct. 2369, 2375 (2019) (plurality opinion) (describing the right to trial by jury as "'the heart and lungs, the mainspring and the center wheel' of our liberties, without which 'the body must die; the watch must run down; the government must become arbitrary'") (quoting Letter from Clarendon to W. Pym (Jan. 27, 1766), in 1 Papers of John Adams 169 (R. Taylor ed., 1977)).  The Confrontation Clause of the Sixth Amendment protects the integrity of the jury trial, commanding that the reliability of evidence introduced against a defendant be "assessed in a particular manner: by testing in the crucible of cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

Finally, the burden of proof.  The due process clause of the Fifth Amendment, and its counterpart in the Fourteenth Amendment, require that a defendant be proven guilty beyond a reasonable doubt.  That standard "provides concrete substance for the presumption of innocence – that . . . 'elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'"  *In re Winship*, 397 U.S. 358, 363 (1970) (quoting *Coffin v. United*

8

*States*, 156 U.S. 432, 453 (1895)); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) (discussing the reasonable doubt standard).

Taken together, those amendments "indisputably entitle a criminal defendant to 'a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)); *see also Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). In so doing, they act as a bulwark against the arbitrary exercise of power by government, even at the expense of making it more difficult to convict the guilty.

Those fundamental constitutional protections undoubtedly apply when a person is prosecuted—accused of committing a new criminal offense—in federal court. *Betterman v. Montana*, 578 U.S. 437, 441-43 (2016) (explaining the rights that apply at each stage of a criminal prosecution). With the exception of the right to indictment, the fundamental criminal trial rights apply, through the Fourteenth Amendment, in state court prosecutions. They applied, for example, when

Peguero was charged in New York state court with assaulting his ex-girlfriend by striking her over the head with a glass bottle.[1]

According to the majority, however, Peguero was entitled to none of those constitutional protections in federal court when he was accused, found guilty, and sentenced to serve more than two years in federal prison for committing that very same assault. Peguero was on supervised release at the time he was accused of the crime, the majority explains, and was therefore required to comply with certain conditions—including the "condition" that he not commit a new federal, state, or local offense. 18 U.S.C. § 3583(d). If the district court found by a preponderance of the evidence that Peguero committed such an offense, it could "revoke" his term of supervised release and require him to "serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release . . . ." 18 U.S.C. § 3583(e)(3). Because the district court was merely "revoking" supervised release when it sentenced him to twenty-eight months in prison, the majority holds, Peguero was not entitled to the constitutional protections that ordinarily accompany a new criminal prosecution. He was

---

[1] Although the right to indictment has not been formally incorporated against the states, New York, where Peguero was charged with assault, guarantees the right to indictment for felony charges. *See* N.Y. Const. art. I, § 6 ("No person shall be held to answer for a capital or otherwise infamous crime . . . unless on indictment of a grand jury. . . .").

instead entitled only to the limited procedural protections historically afforded to one facing revocation of probation or parole.

I cannot agree that the Constitution affords Peguero such limited protection.

## III.    Supervised Release is Different

Supervised release was not intended to be punitive.  Created in 1984 by the Sentencing Reform Act ("SRA"), supervised release is a "unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), explicitly designed to afford a defendant rehabilitation. *See* S. Rep. No. 98-225, at 124 (1983) (explaining that the primary purpose of supervised release is "to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment . . . but still needs supervision and training programs after release").  That rehabilitative purpose is reflected in the text of the SRA; "a court may *not* take account of retribution . . . when imposing a term of supervised release." *Tapia v. United States*, 564 U.S. 319, 326 (2011); 18 U.S.C. § 3583(c); *see also United States v. Johnson*, 529 U.S. 53, 59 (2000)

11

("Supervised release fulfills rehabilitative ends, distinct from those served by incarceration.").[2]

The architects of the SRA meant to make a clean break with past federal sentencing practice. *Johnson v. United States*, 529 U.S. 694, 724-25 (2000) (Scalia, J., dissenting); *see also Mistretta v. United States*, 488 U.S. 361, 366 (1989) (noting that the SRA ushered in "sweeping reforms"); *Haymond*, 139 S. Ct. at 2382 (plurality opinion) (describing the SRA as part of an effort to "overhaul[] federal sentencing procedures"). By design, supervised release is structurally different from parole, which the SRA prospectively abolished, and from probation, which it reformed.

First, consider parole. "The essence of parole is release from prison, before the completion of a sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). Under the now-abolished federal parole system, a defendant "was generally eligible for parole after serving only one-third of his sentence" and could be released to serve the remainder of that prison sentence in the community, so long as he complied with certain restrictions. *Haymond*, 139 S. Ct. at 2389 (Alito, J.,

---

[2] On the premise that supervised release fulfills rehabilitative ends, "courts have held that sentencing defendants to lifetime terms of supervised release does not violate the Eighth Amendment." Mica Moore, *Escaping from Release: Is Supervised Release Custodial under 18 U.S.C. § 751(a)?*, 83 U. Chi. L. Rev. 2257, 2267 (2016).

dissenting). If he violated any of those restrictions, he could be returned to prison to serve "the remaining balance of the term of imprisonment." *Id.* at 2377 (plurality opinion); *see also Johnson*, 529 U.S. at 725 ("[W]hen parole was revoked (unlike when supervised release is revoked), there was no need to impose a new term of imprisonment; the term currently being served (on parole) was still in place.") (cleaned up). Parole, in other words, "replace[d] a portion of the defendant's prison term." *Id.* at 2382 (plurality opinion).

Probation is similar. Instead of early release from prison, however, probation allows a defendant to "avoid prison altogether" and serve his *entire* sentence in the community, again subject to certain restrictions. *Haymond*, 139 S. Ct. at 2381 (plurality opinion); *see also* S. Rep. No. 98-225, at 59 (1983) (describing probation as a "form of sentence with conditions" and an "alternative to a term of imprisonment"). Like parole, probation is a discretionary reprieve from prison, once considered "an act of grace to one convicted of a crime." *Escoe v. Zerbst*, 295 U.S. 490, 492 (1935). Leniency is granted in exchange for a defendant's promise to comply with certain conditions; failure to do so at least arguably breaches the "trust" placed in the defendant by the sentencing judge. *United States v. Sindima*, 488 F.3d 81, 86 (2d Cir. 2007); *see also* Jacob Schuman, *Revocation and Retribution*, 96

Wash. L. Rev. 881, 907 (2021) ("By sentencing a defendant to probation, the [court] trusts in the promise that they will return to society and function as a responsible, self-reliant person. The scope of this trust is expressed in the conditions of probation, which the defendant must obey in exchange for being spared a term of imprisonment.") (cleaned up). To sanction that breach of trust, the court may (and, sometimes, must) revoke probation and resentence the defendant "to any term that could have been imposed" on the original conviction. *United States v. Verkhoglyad*, 516 F.3d 122, 128 (2d Cir. 2008); 18 U.S.C. § 3565. Accordingly, the term of incarceration that can be imposed upon revocation is limited by "the maximum statutory penalty" applicable to the underlying offense. *United States v. Goffi*, 446 F.3d 319, 323 (2d Cir. 2006).

Probation and parole allow a defendant to serve all or part of a sentence of imprisonment in the community in exchange for compliance with certain conditions, and revocation of either therefore "deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of [those] . . . restrictions." *Morrissey*, 408 U.S. at 480; *Gagnon v. Scarpelli*, 411 U.S. 778, 781 (1973). Commensurate with the pared-down liberty interest at stake, a probationer or parolee is entitled only

14

to limited procedural protections before a court revokes the grant of leniency and reimposes the original term of imprisonment (parole) or imposes the term of imprisonment originally available (probation). *Id.*; *see also Gagnon*, 411 U.S. at 781-82. Those protections include:

> (a) written notice of the claimed violations of [probation or] parole; (b) disclosure to the [probationer or] parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body . . . ; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking [probation or] parole.

*Gagnon*, 411 U.S. at 786 (quoting *Morrissey*, 408 U.S. at 489) (cleaned up).[3]

Supervised release is structurally different. Rather than replacing imprisonment, it is a period of post-confinement monitoring that begins only *after* a defendant has completed her full carceral sentence. *See* 18 U.S.C. § 3583(a) (providing that "[t]he court . . . may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release *after* imprisonment") (emphasis mine); *Mont v. United States*, 139 S. Ct. 1826, 1833 (2019) ("supervised release has no statutory function until confinement ends") (cleaned up); *United*

---

[3] Those procedural protections were later transposed, in substance, into Federal Rule of Criminal Procedure 32.1, which governs probation and supervised release revocation proceedings. *See* Fed. R. Crim. P. 32.1 (Notes of Advisory Committee on Rules —1979).

*States v. Granderson*, 511 U.S. 39, 50-51 (1994) ("Supervised release, in contrast to probation, is not a punishment in lieu of incarceration . . . . [P]robation *sans* imprisonment and supervised release following imprisonment are sentences of unlike character.");[4] *Johnson*, 529 U.S. at 725 ("Unlike parole, which replaced a portion of a defendant's prison sentence, supervised release is a separate term imposed at the time of initial sentencing.") (Scalia, J., dissenting); *Haymond*, 139 S. Ct. at 2382 (plurality opinion) ("[S]upervised release wasn't introduced to replace a portion of the defendant's prison term, only to encourage rehabilitation *after* the completion of his prison term.") (cleaned up); Mica Moore, *Escaping from Release: Is Supervised Release Custodial under 18 USC § 751(a)?*, 83 U. Chi. L. Rev. 2257, 2263 (2016) ("supervised release is not an alternative to incarceration, but a separate and additional period of monitoring concerned with facilitating the reintegration of the defendant into the community"); *United States v. Thompson*, 777 F.3d 368, 372 (7th

---

[4] The majority sets forth a hypothetical fact pattern to support the claim that acknowledging supervisees' constitutional rights "would lead to probationers and supervised releasees being conferred with vastly different constitutional rights." *Ante* at 43 – 44. To the contrary, the difference results not from *recognizing* supervisees' constitutional rights, but by *failing* to do so; that vast difference exists today. In the majority's hypothetical, the probationer was afforded the full range of constitutional rights for the conduct underlying his new prison sentence, *i.e.*, he was indicted and was offered the right to jury trial on the original bank fraud conviction. As things now stand, the probationer is conferred with vastly greater constitutional rights than the supervisee; that disparity can only be corrected by recognizing that the supervisee similarly enjoys the right to indictment and the right to a jury trial for *the conduct for which he will be sentenced*, *i.e.*, the violation conduct.

Cir. 2015) ("Parole mitigates punishment; supervised release augments it. . . .");

Fiona Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U.L. Rev. 958, 997 (2013).[5]

Although compliance with certain "conditions" is required of one sentenced to supervised release, supervised release is no reprieve from prison.[6] As a result, the liberty of one sentenced to supervised release is distinct from the contract-like "conditional" liberty described by *Morrissey* (and, later, *Gagnon*), where reprieve

---

[5] Originally, the SRA included no mechanism for "revocation" of supervised release. Doherty, *supra*, at 999-1000. Instead, violations of court-imposed conditions could be punished only by charging and prosecuting a defendant for criminal contempt. *Id.* In 1986, however, Congress passed the Anti-Drug Abuse Act ("ADAA"), which, in addition to implementing new mandatory minimums for certain drug crimes, authorized a judge to:

> revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release without credit for time previously served on post-release supervision, if it finds by a preponderance of the evidence that the person violated a condition of supervised release.

*Id*. at 1000-01. With that last-minute "technical amendment" to the statute, the ADAA "grafted the . . . same rules of diluted procedure applicable to parole and probation revocation hearings" onto supervised release revocation proceedings, *id*. at 1001-02, thus creating the constitutional problems at the crux of this case.

[6] In *Mont*, Justice Thomas, writing for the majority, described supervised release as "a form of postconfinement monitoring that permits a defendant a kind of conditional liberty by allowing him to serve part of his sentence outside of prison." 139 S. Ct. at 1833 (cleaned up). That description may logically describe probation or parole, but it does not accurately reflect the nature of supervised release. *See* S. Rep. No. 98-225, at 125 (1983) (noting different purposes of supervised release and imprisonment). Moreover, there is no evidence that judges in practice impose shorter prison sentences by virtue of the discretion to add a period of supervised release; judges instead "impose supervised release on virtually all eligible defendants, with both the average prison sentence and the number of people under supervision rising dramatically since 1984." Schuman, *supra*, at 908; *see also* Christine S. Scott-Hayward, Shadow Sentencing: The Imposition of Federal Supervised Release, 18 Berkeley J. Crim. L. 180, 206 (2013).

from prison is given in exchange for continued compliance with certain restrictions. *Cf. Morrissey*, 408 U.S. at 478 ("those who are *allowed to leave prison early* are subjected to specified conditions *for the duration of their terms*") (emphasis mine). Rather than a form of "conditional liberty," then, supervised release is more aptly described as "restricted liberty." Schuman, *supra* at 908 n.198.

## IV. The Constitutional Workaround

As a plurality of the Supreme Court recognized in *Haymond*, the structural differences between parole, probation, and supervised release may, in the context of revocation, "bear[] constitutional consequences." *Haymond*, 139 S. Ct. at 2382 (considering the constitutionality of section 3583(k)). Relevant here, although section 3583(e) speaks of "revocation," a judge who "revokes" supervised release is not reimposing the term of imprisonment from which she previously granted a reprieve. Instead, she is imposing a *new* term of imprisonment. *See Johnson*, 529 U.S. at 715 ("the ordinary meaning of revoke is to annul by recalling or taking back") (Scalia, J., dissenting) (cleaned up); *United States v. Trotter*, 321 F. Supp. 3d 337, 346-47 (E.D.N.Y. 2018) ("The term 'revoke' appears to be somewhat of a misnomer. . . . Supervised release is not being 'revoked'; rather, a supervisee is being punished for violating conditions. . . ."); *see also United States v. Ka*, 982 F.3d

219, 229 (4th Cir. 2020) (Gregory, J., dissenting) ("Unlike parole and probation revocations, supervised release revocation proceedings uniquely allow for the imposition of new prison sentences.").

As the Supreme Court recognized in *Johnson*, the idea that a court can sanction a supervised release violation with additional imprisonment raises "serious constitutional questions." *Johnson*, 529 U.S. at 700. First, though the acts of violation may "lead to reimprisonment, the violative conduct need not be criminal." *Id.* Even when the act of violation is a criminal offense in its own right (which, because of section 3583(d), it often will be), guilt "need only be found by a judge under a preponderance of the evidence standard, not by a jury beyond a reasonable doubt." *Id.* In addition (though not discussed in *Johnson*) nearly every violation of supervised release carries a potential penalty of more than one year of imprisonment, *see* 18 U.S.C. § 3583(e)(3) (setting forth penalties available upon revocation), implicating the right to indictment. *See Mackin v. United States*, 117 U.S. 348, 354 (1886). Finally, when the "acts of violation . . . may be the basis for separate prosecution," double jeopardy problems arise. *Johnson*, 529 U.S. at 700. The problem, as the *Johnson* Court implicitly recognized, is that imposing a new term of imprisonment to sanction a supervised release violation mirrors the

19

structure of a traditional criminal prosecution to which the fundamental trial rights apply.

Since enactment of the SRA, courts have dodged the constitutional "difficulties" created by section 3583 by "[t]reating postrevocation sanctions as part of the penalty for the initial offense," *see id.* at 700, rather than as punishment for the violative conduct itself. *See, e.g., United States v. McInnis*, 429 F.3d 1, 5 (1st Cir. 2005) ("Although the punishment imposed in response to the release violations is in addition to prior punishment, it is treated as part of the penalty for the initial offense, thus obviating double jeopardy concerns."); *United States v. Jackson*, 559 F.3d 368, 371 (5th Cir. 2009); *United States v. Sharpe*, 2021 U.S. App. LEXIS 29416, at *7 (11th Cir. Sept. 29, 2021) (unpublished) ("the revocation of [appellant's] supervised release and the resulting prison sentence are considered a part of the penalty for [his] original offense"); *see also* Doherty, *supra*, 1004-10 (discussing development of caselaw attributing postrevocation penalties to the original offense).[7]

---

[7] In an attempt to avoid constitutional problems, courts have stumbled into a statutory bramble; with few exceptions, Congress in the SRA "forbade the federal courts from 'modifying a term of imprisonment once it has been imposed.'" *United States v. Jones*, 980 F.3d 1098, 1103-04 (6th Cir. 2020) (quoting Sentencing Reform Act of 1984, Pub. L. No. 98-473, Title II, ch. 2, § 212(a), 98 Stat. 1837, 1998 (enacting 18 U.S.C. § 3582(c)); *see also Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 54 (1989) ("The general rule is that finality in the context of a criminal prosecution is defined by a

In a similar attempt to avoid those constitutional pitfalls, some courts have construed the sanctions imposed for violating the conditions of supervised release as punishment for breaching the court's "trust," rather than as punishment for the violative conduct itself. *See Haymond*, 139 S. Ct. at 2386 (Breyer, J., concurring) ("[t]he consequences that flow from violation of the conditions of supervised release are first and foremost considered sanctions for the defendant's 'breach of trust'—his 'failure to follow the court-imposed conditions' that followed his initial conviction—not 'for the particular conduct triggering the revocation as if that conduct were being sentenced as new federal criminal conduct'") (quoting U.S. Sent'g Guidelines Manual ch. 7, pt. A, intro. 3(b) (Nov. 2018) (cleaned up)); *United States v. Edwards*, 834 F.3d 180, 194 (2d Cir. 2016) ("the critical 'subject under consideration' at a revocation proceeding is . . . the breach of trust manifested by the violation") (citing to U.S. Sent'g Guidelines Manual, ch. 7, pt. A., intro. 3(b)).

By labeling reimprisonment for supervised release violations something other than punishment for the violative conduct itself, courts have artificially distinguished the rights afforded to one facing revocation of supervised release

---

judgment of conviction and the imposition of sentence."). But *Johnson* intimates that a court may do precisely that—modify the original prison sentence by adding a new period of incarceration. 529 U.S. at 700.

21

from those afforded to an accused in a criminal prosecution. *See, e.g., United States v. Doka*, 955 F.3d 290, 294 (2d Cir. 2020) (post-revocation consequences are "authorized by the original conviction" and defendants in revocation proceedings are therefore not entitled to "the full panoply of rights that criminal defendants generally enjoy") (cleaned up); *United States v. Meeks*, 25 F.3d 1117, 1123 (2d Cir. 1994), *abrogated on other grounds by Johnson*, 529 U.S. 694 (constitutional protections that govern criminal prosecutions "have been ruled inapplicable because the conduct that violates the conditions of supervised release is not viewed as a separate criminal offense");[8] *United States v. Soto-Olivas*, 44 F.3d 788, 792 (9th Cir. 1995) ("The limited procedural protections afforded [revocation] proceedings are justified precisely because revocation of supervised release is not new punishment for a new crime. It is part of the whole matrix of punishment which arises out of a defendant's original crime . . . .") (cleaned up); *United States v. Work*, 409 F.3d 484, 491 (1st Cir. 2005) (reasoning that "once the original sentence has been imposed in a criminal case, further proceedings with respect to that sentence are not subject to Sixth Amendment protections").

---

[8] *Meeks* additionally suggests that the statutory limitation on procedural protections in revocation proceedings resolves any constitutional question. *See id*. at 1123; *see also* Doherty, *supra*, at 1006 (discussing reasoning in *Meeks*). But, of course, Congress's passage of a statute does not alleviate federal courts of the burden of ensuring its constitutionality. *Cf. Booker*, 543 U.S. at 248.

Relatedly, this Court has suggested that the conditional nature of the liberty afforded one on supervised release justifies the surrender of constitutional rights in a revocation proceeding. *See United States v. Carlton*, 442 F.3d 802, 809 (2d Cir. 2006) ("[t]he full panoply of procedural safeguards does not attach to [supervised release] revocation proceeding because . . . a *probationer* [sic] already stands convicted of a crime") (cleaned up) (emphasis mine). According to the *Carlton* Court, the "conditions placed on a defendant's liberty in supervised release encompass by implication" the "condition . . . that the defendant surrender his rights to trial by jury and to having accusations against him proved beyond a reasonable doubt." 442 F.3d at 810; *see also United States v. Ward*, 770 F.3d 1090, 1098-99 (4th Cir. 2014) ("Like parolees, individuals on supervised release also enjoy only 'conditional liberty' because they already have been convicted of the underlying criminal offense . . . . [T]he conditional liberty to which those under supervised release are subject entails the surrender of certain constitutional rights . . . ."); *United States v. Cunningham*, 607 F.3d 1264, 1268 (11th Cir. 2010) (same).

But the fact that supervised release is imposed as part of a criminal sentence does not convert a new and additional term of imprisonment triggered by new conduct into part of the original penalty imposed. Nor does supervised release

involve the same sort of conditional liberty relied upon in *Morrissey* and *Gagnon*; it does not replace prison on the condition that an individual abide by certain rules for the duration of that prison sentence.[9] It is similarly unpersuasive to suggest that any new term of imprisonment imposed merely sanctions a breach of "trust" rather than the underlying violation conduct; including a sentence of supervised release entails no leap of faith or "trust" by a district court, nor does the evidence suggest that judges impose less severe prison terms by virtue of the discretion to include a term of supervised release. *See* Schuman, *supra*, at 907 ("[S]upervised release is the *opposite* of trust— additional supervision to follow full service of the prison term.").

Because "revocation" of supervised release is nothing less than new punishment imposed by a court after finding an accused guilty of a new wrong, a supervised release revocation proceeding is fundamentally a new criminal prosecution.[10] *See Haymond,* 139 S. Ct. at 2376 (plurality opinion) (noting that a

---

[9] The majority points out that the Sentencing Commission "explicitly considered and rejected the approach of treating supervised release violations as new criminal conduct." *Ante* at 40 n.15. But, of course, the Sentencing Commission does not determine the constitutionality of a statutory scheme.

[10] Although the majority acknowledges the structural distinctions between parole, probation, and supervised release, it nonetheless maintains that "it goes too far to argue . . . that because a term of supervised release is distinct from the original *term of incarceration*, it must also be distinct from the original *sentence*." *Ante* at 38. In my view, the issue is not whether to consider the term of

crime was traditionally defined as those "acts to which the law affixes . . . punishment" and a criminal prosecution as "the process of exhibiting formal charges against an offender before a legal tribunal") (cleaned up); *id.* at 2393 (Alito, J., dissenting) (a prosecution was historically defined as "the means adopted to bring a supposed offender to justice and punishment by due course of law") (quoting H. Holthouse, *New Law Dictionary* 344 (1847)); *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 221 (2008) ("'Prosecution,' as Blackstone used the term, referred to 'instituting a criminal suit,' by filing a formal charging document—an indictment, presentment, or information—upon which the defendant was to be tried in a court with power to punish the alleged offense.") (Thomas, J., dissenting) (quoting 4 W. Blackstone, Commentaries on the Laws of England 309 (1769)) (cleaned up); *see also id.* at 223 ("the term 'criminal prosecution' in the Sixth Amendment refers to the commencement of a criminal suit by filing formal charges in a court with jurisdiction to try and punish the defendant") (cleaned up).

Consider the sequence of events in the case at bar. In 2007, following a conviction for armed bank robbery, Peguero was sentenced to a lengthy term of

---

supervised release part of the original sentence; the issue is whether imposition of a new term of imprisonment as punishment for *new conduct* is materially different than resentencing an individual on the *original offense conduct* (probation) or reimposing the term of imprisonment from which he or she was *granted a reprieve* (parole).

imprisonment followed by a term of supervised release. Nearly a decade later, Peguero got into an altercation with his former girlfriend, during which he purportedly struck her over the head with a glass bottle. Although there was insufficient evidence to prove his guilt beyond a reasonable doubt in state court, Peguero was nonetheless accused of assault in federal court, and, following a hearing where a United States Attorney attempted to prove that he had committed that crime, found guilty by a judge employing a preponderance of the evidence standard. He was then sentenced to serve twenty-eight months in federal prison.

The majority maintains that "well-settled, binding precedent"—from which we are not free to deviate—compels that unnatural outcome. *Ante* at 49. But decisions from this Circuit purporting to distinguish the rights of an accused in a criminal prosecution from those afforded in a supervised release revocation proceeding offer a jumble of inconsistent and artificial reasons for doing so. In particular, many opinions rely heavily on *Morrissey* to declare that supervised release revocation proceedings are not criminal prosecutions. *E.g., United States v. Diaz,* 986 F.3d 202, 208–09 (2d Cir. 2021); *United States v. Carthen*, 681 F.3d 94, 99 (2d Cir. 2012). *Morrissey*, however, was handed down more than a decade before supervised release was created, and its holding is premised in part on structural

26

aspects of parole that do not apply to supervised release. *See Morrissey*, 408 U.S. at 477, 480 (explaining that "[t]he essence of parole is release from prison, before the completion of sentence" and noting that "supervision [of a parolee] is not directly by the court" and that "[r]evocation deprives an individual . . . only of . . . conditional liberty").

Some opinions invoke the rationale set forth in *Johnson*, suggesting that the inclusion of a term of supervised release as part of a criminal sentence authorizes any penalty imposed for a violation of its conditions. *See, e.g., Doka*, 955 F.3d at 294. Other opinions, however, recognize the flaws of that rationale. *See, e.g., Carlton*, 442 F.3d at 809 ("[W]e cannot fully attribute the penalty imposed at a revocation hearing to the original conviction."); *United States v. McNeil*, 415 F.3d 273, 277 (2d Cir. 2005) (concluding in the same breath that "the imprisonment that ensues from revocation is . . . wholly derived from a different source" than the original sentence, but also that "imposition supervised release is authorized by the original conviction, and so too are the consequences of its violation"); *United States v. Smith*, 982 F.2d 757, 761 (2d Cir. 1992) (concluding that the original term of imprisonment and the term of imprisonment imposed following revocation are "separate punishments"); *United States v. Wirth*, 250 F.3d 165, 170 n.3 (2d Cir. 2001)

27

("punishment for a violation of supervised release is separate from punishment for the underlying conviction and may, when combined with the latter, exceed the statutory maximum for the underlying offense"); *see also United States v. Pettus*, 303 F.3d 480, 487 (2d Cir. 2002) (attempting to reconcile the inconsistency). Still others conclude that revocation merely sanctions a "breach of trust," but do so without identifying the "trust" the district court has placed in a defendant by sentencing him to a term of supervised release. *See, e.g., Edwards*, 834 F.3d at 194-96.

In sum, I cannot agree that this Court has articulated a clear or consistent basis for concluding that the rights afforded an accused in a criminal prosecution do not extend to supervised release revocation proceedings. Moreover, although the majority contends that the "United States Supreme Court. . . ha[s] thoroughly examined the legal principles supporting the constitutionality of the current revocation system," *see ante* at 36, the sparse Supreme Court jurisprudence on the constitutionality of supervised release belies that contention. In particular, "between 1984 and 2019, the Supreme Court said almost nothing about how this new system of post-release supervision fit into the nation's constitutional framework." *Ka*, 982 F.3d at 228 (Gregory, J., dissenting) (quoting Jacob Schuman, *Supervised Release Is Not Parole*, 53 Loy. L.A. L. Rev. 587, 612 (2020)). Significantly,

the Supreme Court has not explicitly considered whether supervisees, as opposed

to probationers and parolees, enjoy a right to indictment for violation conduct that

could send them to prison for more than one year.[11]

Tellingly, the majority opinion (and the jurisprudence on which it relies) is

littered with statements revealing the constitutional cracks in the statutory scheme

governing supervised release; at various points, the majority suggests that

postrevocation penalties should be "treated" as part of the penalty for the original

offense, or "deemed" distinguishable from a criminal prosecution. *See ante* at 23,

30, 38 ("[r]evocation proceedings are not *deemed* part of a criminal prosecution")

(quoting *Carthen*, 681 F.3d at 99) (emphasis mine); *ante* at 42 ("[I]t makes little

sense to *treat* [a defendant] as the accused . . . when he has been charged not with

a crime, but with violating the terms of a jury-authorized sentence that flowed

from his original conviction.") (quoting *Haymond*, 139 S. Ct. at 2393 (Alito, J.,

---

[11] The majority asserts that this Court has "repeatedly held" that there is no right to indictment for charged violations of supervised release that subject a person to more than one year in prison. *Ante* at 31. As the majority acknowledges, however, that statement is merely an extrapolation from the decisions holding that supervised release revocation proceedings are not "prosecutions." *Id*. at 32 n.8. To be clear, neither this Court nor the Supreme Court has ever analyzed whether supervised release proceedings implicate the right to indictment. Our difference on this point can be explained as follows: the majority suggests that because supervised release proceedings are not deemed criminal prosecutions, the right to indictment cannot apply; I suggest that because supervised release proceedings subject defendants to more than one year in prison for conduct that has never been the subject of an indictment, the right to indictment (and the related fundamental criminal trial rights) must apply.

dissenting) (emphasis mine); *see also Meeks*, 25 F.3d at 1123 ("the conduct that violates the conditions of supervised release is not *viewed* as a separate criminal offense") (emphasis mine).

But the scope of constitutional rights does not vary with the words we use to characterize a proceeding. It is the substance that matters. Peguero was sentenced for bank robbery in 2007; that conviction cannot constitutionally be invoked years later to justify imprisoning him for allegedly committing felony assault. To say that Peguero was not an "accused" for purposes of his supervised release violation proceeding, or that the proceeding was anything other than a new criminal prosecution, is merely an attempt "to dodge the demands of the Fifth and Sixth Amendments by the simple expedient of relabeling." *Haymond*, 139 S. Ct. at 2379 (plurality opinion); *cf. In re Winship*, 397 U.S. at 365-66 ("labels and good intentions do not themselves obviate the need for criminal due process safeguards . . . for a proceeding where the issue is whether the [individual] will be . . . subjected to the loss of his liberty for years. . .") (cleaned up).

I therefore cannot agree that Peguero was entitled to less than the full panoply of rights that attend a new felony prosecution, including: indictment, trial by an impartial jury, the right to confront and cross-examine his accusers, and the

right to be proven guilty beyond a reasonable doubt before he was sentenced to more than two years in prison. *Cf. Haymond*, 139 S. Ct. at 2386 (Breyer, J., concurring) (holding a different subsection of 3583 unconstitutional because it too "closely resemble[d] the punishment of new criminal offenses, but without granting a defendant the rights, including the jury right, that attend a new criminal prosecution").

## V.    The Consequences

The majority defends the constitutionality of the current supervised release revocation scheme in part by citing to concerns about the chaos that might result if constitutional rights were extended to revocation proceedings. *See ante* at 46-49; *see also Haymond*, 139 S. Ct. at 2388 (Alito, J., dissenting) ("[I]f every supervised-release revocation proceeding is a criminal prosecution . . . the whole concept of supervised release will come crashing down."). I do not dispute that if supervisees' constitutional rights were properly recognized, the consequences would be significant. We do not, however, make determinations about the scope of constitutional rights in order to avoid disruption or based on what would be

31

expedient or convenient.[12] *Cf. Booker*, 543 U.S. at 244 (quoting 4 Commentaries on the Laws of England 343–344 (1769)) ("However *convenient* these new methods of trial may appear at first, (as doubtless all arbitrary powers, well executed, are the most *convenient*) yet let it be again remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters.") (cleaned up).

Surely, it would be most efficient to permit a judge to determine guilt by a preponderance of the evidence in *every* criminal prosecution, without going to the trouble of obtaining an indictment, empaneling a jury, calling witnesses, and requiring proof of guilt beyond a reasonable doubt. But "the Constitution's guarantees cannot mean less today than they did the day they were adopted," and the protections of the Fifth and Sixth Amendment cannot be denied merely because they are inconvenient or burdensome. *Haymond*, 139 S. Ct. at 2376 (plurality opinion). A statute that establishes a system of criminal justice that violates defendants' constitutional rights cannot stand. *See Booker*, 543 U.S. at 226. The supervised release system was intended to serve a rehabilitative purpose; it

---

[12] Although the majority recognizes that the potential burden of affording additional protections to supervisees should play no role in our determination of whether the statute is constitutional, its arguments against extending those constitutional rights rest in significant part on the potential consequences that might result.

should be used to do so, not to provide an expedient means of returning people to prison.

## VI.    Conclusion

Although I acknowledge that the majority's holding today is supported by precedent, I cannot agree that Peguero was entitled to anything less than the full panoply of constitutional rights prior to being sentenced to twenty-eight months in prison for committing felony assault. Because there is no dispute that he was not granted those rights, I would vacate the judgment of the district court with respect to Specification Four. I concur with the majority, however, that a remand to correct the judgment with respect to Specification Nine is necessary.