*Gilead Community Services, Inc. v. Town of Cromwell*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔉𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

---

August Term 2023
Argued: February 13, 2024
Decided: August 12, 2024

No. 22-1209

---

GILEAD COMMUNITY SERVICES, INC., CONNECTICUT FAIR HOUSING CENTER, INC.,

*Plaintiffs-Appellees,*

*v.*

TOWN OF CROMWELL,

*Defendant-Appellant,*

ENZO FAIENZA, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS MAYOR OF THE TOWN OF CROMWELL, ANTHONY SALVATORE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS TOWN MANAGER OF THE TOWN OF CROMWELL, JILLIAN MASSEY, IN HER OFFICIAL CAPACITY AS THE ZONING ENFORCEMENT OFFICER OF THE TOWN OF CROMWELL,

*Defendants.*

Appeal from the United States District Court
for the District of Connecticut
No. 17-cv-627, Bolden, *Judge*.

Before:        Parker, Lynch, and Nathan, *Circuit Judges*.

The Town of Cromwell appeals from a judgment of the United States District Court for the District of Connecticut (Bolden, J.) after a jury verdict finding it liable for violating the Fair Housing Act and Americans with Disabilities Act and awarding compensatory and punitive damages against it.  On appeal, the town argues that the district court erred in applying a motivating-factor (rather than but-for) causation test to claims under the Fair Housing Act, and in subjecting a municipality to vicarious liability and punitive damages under the Fair Housing Act.  It also argues that the amount of punitive damages assessed against it is unconstitutionally excessive.  We reject each of Cromwell's arguments regarding the Fair Housing Act, but agree that the punitive damages award was unconstitutionally excessive.

First, Cromwell's causation argument is squarely foreclosed by binding Circuit precedent, which no intervening Supreme Court decision has effectively overruled.  Second, Cromwell provides no basis to exempt municipalities from the vicarious liability that is generally available under the Fair Housing Act.  Third, the text of the Fair Housing Act unambiguously allows for punitive damages with no exception for municipal defendants and we decline to create a judicial carveout from the statute where Congress has not created one. Fourth and finally, we conclude that the punitive damages award in this case is unconstitutionally excessive.  Despite Cromwell's reprehensible conduct, the ratio of punitive to compensatory

2

damages is too high, and the disparity between the punitive damages and the civil fines available for similar conduct is too great, for the award to comport with due process. We therefore **AFFIRM** in part, **VACATE** in part, and **REMAND** for further proceedings.

————

Thomas R. Gerarde, Howd & Ludorf, LLC, Hartford, CT, *for Defendant-Appellant*.

Tara K. Ramchandani (Yiyang Wu, Valerie Comenencia Ortiz, Gemma Donofrio, *on the brief*), Relman Colfax PLLC, Washington, D.C., *for Plaintiffs-Appellees*.

————

NATHAN , *Circuit Judge*:

This case involves the Fair Housing Act, a landmark civil rights statute passed by Congress as a vital tool for preventing, rooting out, and deterring housing discrimination in its various forms. A jury found the town of Cromwell, Connecticut liable for a campaign of discriminatory conduct meant to keep a group home for individuals with mental health disabilities from opening in the town, in violation of the Fair Housing Act (FHA) and Americans with Disabilities Act (ADA). The jury assessed both compensatory and punitive damages against Cromwell for its actions. On appeal, the town argues that the district court wrongly applied a motivating-factor causation test to claims under the FHA and wrongly subjected it to vicarious liability

and punitive damages under the FHA. It further argues that the amount of punitive damages awarded by the jury is unconstitutionally excessive. We agree that the punitive damages award is unconstitutionally excessive, but affirm the district court in all other respects.

To begin, binding Circuit precedent establishes that motivating-factor, rather than but-for, causation applies to disparate treatment and retaliation claims under the FHA. Cromwell argues that these precedents have been abrogated by intervening Supreme Court decisions interpreting other civil rights statutes. But none of the decisions the town points to undercut the law of our Circuit regarding the FHA in particular. The town fails to show that our precedents have been abrogated.

We also reject Cromwell's other statutory arguments. It is undisputed that the FHA generally incorporates the traditional principle of vicarious liability, and Cromwell provides no persuasive reason for exempting municipalities from that form of liability. Similarly, the FHA's text unambiguously permits private plaintiffs to recover punitive damages and Cromwell points to no basis in the statute for carving out an exception for municipal defendants.

On the other hand, we agree with Cromwell that the punitive damages award in this case is unconstitutionally excessive. Although Cromwell engaged in highly reprehensible conduct, the ratio between the punitive damages and the actual and potential harms resulting from that conduct is simply too high to comport with due process. Further, the available fines for comparable conduct support the conclusion that the award here is excessive. The three guideposts

4

established by the Supreme Court for review of punitive damages demonstrate that the award in this case violates due process.

Accordingly, we **AFFIRM** in part and **VACATE** in part the judgment of the district court, and **REMAND** for further proceedings.

## BACKGROUND

This case comes to us after a jury found Defendant-Appellant, the Town of Cromwell, liable for violating the FHA and ADA. Plaintiffs-Appellees Gilead Community Services, Inc. (Gilead) and Connecticut Fair Housing, Inc. sued the town and several of its officials based on a pattern of discrimination and retaliation after Gilead attempted to open a group home for individuals with mental health disabilities in Cromwell. At trial, they presented evidence from which the jury could reasonably have found the following.

Gilead purchased a house in Cromwell to be used as a group home for people with mental health disabilities in March 2015. Soon after, town residents created a Facebook group in which they voiced their opposition to the group home. Cromwell's town manager, mayor, and other officials met with Gilead's CEO regarding the reaction and recommended holding a public forum to respond to residents' concerns.

Gilead agreed, but the boisterous forum did little to calm the growing opposition among town residents and, as became apparent, town officials. The town manager spoke at the forum, opining that the number of group homes in the town should be limited like liquor stores, while a resident compared the prospective group home residents to mass shooters. The day after the forum, Cromwell's

5

mayor then issued a press release requesting that Gilead abandon their plans for the group home, expressly citing the concerns raised at the forum. The mayor and town manager also demanded information about the mental health diagnoses of the group home's prospective residents, while admitting that they would not typically require this sensitive information from any other individuals who happened to be moving to Cromwell.

In May 2015, Gilead learned that the town had gone a step further, taking matters into its own hands. The town had petitioned Connecticut's Department of Public Health to reject a license for Gilead to operate the group home, even though—as the Department of Public Health confirmed—Gilead did not actually require the license. The town then pressed on with its efforts to keep Gilead's group home from opening, unsuccessfully seeking reconsideration from the department. Testimony from Cromwell officials suggested that the filing of this petition was in fact motivated by the controversy in town over Gilead's group home.

Following the unsuccessful Department of Public Health petition, the town tried a new approach. It sent Gilead a cease-and-desist letter claiming that the group home violated zoning regulations and could not be operated without obtaining certain zoning permits, while threatening to fine Gilead if it operated the home without the permits. The town then agreed to withdraw the cease-and-desist letter on the condition that Gilead move only two residents into the home, fewer than Gilead needed for the home to operate successfully.

Soon after, Cromwell's town assessor informed Gilead that its tax exemption application for the home required additional

6

documentation, a request that Gilead had never before encountered with its other homes. Gilead provided the documents, but its tax exemption application was denied nonetheless.

Gilead then experienced two concerning incidents with the Cromwell police. First, after one of the group home's residents left the home unannounced, Gilead called the police for assistance in locating him. Gilead later learned that the police leaked sensitive health information about this individual—information learned from this interaction—to the media. Second, after Gilead's group home was vandalized, the police failed to fully investigate the incident, closing the case within an hour. These two instances confirmed to Gilead that its home for residents with disabilities was not welcome in the town of Cromwell.

Due to all of these events and the town's continued opposition, Gilead decided to close the group home in August 2015. Cromwell officials celebrated the decision in an official press release, applauding Gilead for "listening to the concerns of Town Officials" and recognizing that "this was not the most favorable neighborhood for them to establish a community residence." App'x at 850.

This was not the end of the matter, however. Approximately nine months later, before Gilead filed this lawsuit, Cromwell's town manager warned Gilead's CEO that continuing to fight over the group home could endanger Gilead's tax exemption for a separate property in Cromwell. And indeed, Cromwell then denied the other property's tax exemption at the next opportunity, which Gilead eventually had reinstated through legal action.

Plaintiffs sued the town of Cromwell and its officials for

7

disability discrimination and retaliation under the FHA, ADA, and the Rehabilitation Act of 1973. Specifically, they alleged that Defendants violated Section 804(f)(1) and (2) of the FHA by making housing unavailable and discriminating in the terms and conditions of housing on the basis of disability; violated Section 804(c) of the FHA by making statements indicating a discriminatory preference in housing on the basis of disability; violated Section 817 of the FHA by interfering with and retaliating for Gilead's exercise of its rights under the FHA; and discriminated on the basis of disability in violation of Title II of the ADA and Section 504 of the Rehabilitation Act. The claims against the town officials were dismissed before trial.

A jury found Cromwell liable on the FHA and ADA claims and assessed $181,000 in compensatory damages and $5 million in punitive damages. The district court then denied Cromwell's renewed motion for judgment as a matter of law, rejecting various legal arguments regarding liability under the FHA and determining that the $5 million award of punitive damages was not unconstitutionally excessive. Cromwell timely appealed.

## DISCUSSION

On appeal, Cromwell contests its liability only under the FHA, raising several arguments about the proper interpretation of the statute, as well as the constitutionality of the punitive damages award in this case. We review questions of law, including questions of statutory interpretation, *de novo*. *See, e.g.*, *United States v. Santos*, 541 F.3d 63, 67 (2d Cir. 2008). We likewise review *de novo* the constitutionality of a punitive damages award. *See Cooper Indus., Inc.*

8

*v. Leatherman Tool Grp.*, 532 U.S. 424, 431 (2001).

## I.    Causation

Cromwell's first argument is that the district court erred in applying a motivating-factor, rather than but-for, causation test to determine liability under the FHA.  According to the town, the court should have instructed the jury to determine whether the disability of Gilead's clients was the but-for cause of the town's actions opposing the group home, rather than merely a significant factor in the town's decision to take those actions.  The town acknowledges that this argument is squarely foreclosed by Circuit precedent, but argues that recent Supreme Court decisions have effectively overruled our precedent.  We conclude we remain bound by our precedent.

At the outset, we must approach Cromwell's statutory argument with somewhat more specificity than the town does itself.  The town argues generally that but-for causation should apply to claims under the FHA, but the claims in this case arise under three distinct statutory provisions of the FHA, each with its own text and governing precedent.  Cromwell was found liable not just under Section 804(f) of the FHA for "discriminat[ing] . . . because of a handicap," 42 U.S.C. § 3604(f)(1), (2), but also for violating Section 804(c)'s prohibition on making any statement "that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination," *id*. § 3604(c).  The jury also found that Cromwell had "coerce[d], intimidate[d], threaten[ed], or interfere[d] with" Gilead "in the exercise or enjoyment of, or on account of [Gilead's] having exercised or enjoyed" its rights under Section 817 of the FHA.  *Id.*

§ 3617.

All of Cromwell's arguments, which focus on the necessary causal link between a party's protected identity or status and an FHA defendant's conduct, simply do not map onto Section 804(c) of the FHA. That is because, by its plain text, Section 804(c) is violated even absent any discriminatory transactions or conduct. To be liable, a defendant must simply "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap," whether or not the defendant proceeds to carry out that discriminatory preference. *Id.* § 3604(c). The question under Section 804(c), as this Circuit has long held, is not what caused or motivated any conduct by a defendant but whether a defendant's statement "suggests to an ordinary reader that a particular [protected status or identity] is preferred or dispreferred[.]" *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991); *see also United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005) (emphasizing the reach of Section 804(c)'s "plain language, which applies broadly").

Cromwell provides no reason to deviate from this well-established standard and never articulates how but-for causation would figure into the determination of whether a statement "indicates any preference" in violation of Section 804(c). The kinds of causation arguments that the town advances simply do not apply to this statutory section, and we easily affirm the judgment as to this claim.

Cromwell's arguments are more squarely directed at Sections

804(f) and 817 of the FHA.  The disparate treatment provision, Section 804(f), makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap," or to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."  42 U.S.C. § 3604(f)(1), (2).  Section 817 broadly prohibits various forms of retaliation, by making it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by [the FHA]."  *Id.* § 3617.

The binding precedent of our Circuit establishes that a plaintiff bringing a disparate treatment claim for discrimination under Section 804(f) of the FHA must show that a protected characteristic was one motivating factor causing the defendant's actions taken against the plaintiff.  *See Cabrera v. Jakabovitz*, 24 F.3d 372, 383 (2d Cir. 1994) (noting the plaintiff's burden is "to prove that the adverse action was motivated, at least in part, by an impermissible reason"); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1042-43 (2d Cir. 1979) (emphasizing that the FHA is violated "if race is even one of the motivating factors" behind a defendant's conduct); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (noting that a prima facie case under the FHA requires that an impermissible consideration "was a significant factor" in the decision taken) (quotation marks omitted).

Our precedent also makes clear that a plaintiff alleging retaliation under Section 817 must show that a defendant "took

11

adverse action against the plaintiff, and a causal connection exists between the protected activity and the adverse action," which is satisfied when "retaliatory motive *played a part*" in causing the adverse action. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002) (emphasis added and quotation marks omitted), *superseded by statute on other grounds*; *see also Austin v. Town of Farmington*, 826 F.3d 622, 630-31 (2d Cir. 2016) (citing favorably a decision holding that a Section 817 plaintiff "must demonstrate that intentional discrimination motivated defendants' conduct, at least in part" (quotation marks omitted)).

Cromwell acknowledges that our prior decisions would foreclose its arguments under Sections 804(f) and 817, but claims that intervening decisions of the Supreme Court have effectively overruled our precedents. The town points to three Supreme Court decisions interpreting similar language in other federal antidiscrimination laws to require a but-for causal link between protected characteristics and a defendant's conduct. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 329 (2020) (concerning claims under 42 U.S.C. § 1981); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013) (concerning Title VII retaliation claims); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 169-70 (2009) (concerning claims under the Age Discrimination in Employment Act).

Cromwell argues that we should reach the same result under the FHA. True, there may be some circumstances in which our precedents regarding one statute are effectively overruled by Supreme Court decisions interpreting other statutes. *See Natofsky v.*

12

*City of New York*, 921 F.3d 337, 347 (2d Cir. 2019). But this Court rejected a near-identical argument as recently as 2016, concluding that *Gross* did not demand that we jettison our FHA precedent. *See Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 615-16 (2d Cir. 2016). The conclusion of the Court in *Mhany* was technically dicta. *See id.* at 616 ("Accordingly, even if we overlooked Garden City's present forfeiture, we would adhere to our existing precedent."). Nonetheless, this means that Cromwell asks us not simply to depart from our decades-long precedent, but to deviate also from our Court's recent reaffirmation of that precedent following *Gross.*[1] We see no reason to depart from those multiple layers of precedent.

Our precedent is "binding authority from which we cannot deviate," unless and until it is "overruled either by an en banc panel of our Court or by the Supreme Court." *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) (quotation marks omitted). That important principle finds a narrow exception when "an intervening Supreme Court decision casts doubt on the prior ruling—that is, where the Supreme Court's conclusion in a particular case broke the link on which we premised our prior decision." *Id.* (cleaned up). "For the exception to apply . . . there must be a conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision." *United States v. Afriyie*, 27 F.4th 161, 168 (2d Cir. 2022) (cleaned up) (noting that overruling prior panel decisions

---

[1] Even more recently—and after both *Nassar* and *Comcast*—our Court relied on *Mhany* in applying a motivating-factor causation test under the FHA, albeit in a non-precedential summary order. *See Perricone-Bernovich v. Tohill*, 843 F. App'x 419, 421 (2d Cir. Apr. 16, 2021) (summary order).

"is perilous," in part because it "may diminish respect for the authority of three-judge panel decisions"). We "resort to this exception cautiously," since "less-than-stringent application of the standards for overruling prior decisions not only calls into question a panel's respect for its predecessors but also increases uncertainty in the law by revisiting precedent without cause." *Peguero*, 34 F.4th at 158 (quotation marks omitted).

Stringent application of this principle demands that we adhere to our prior decisions interpreting the FHA. None of the Supreme Court decisions on which Cromwell relies address the FHA. And in fact, they all counsel that we must interpret individual statutes on the basis of their particular text, structure, and history, and caution against unreflective application of rules from one statute to another. *See Gross*, 557 U.S. at 174-75; *Nassar*, 570 U.S. at 351-362; *Comcast*, 589 U.S. at 330-35, 341; *cf. Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 165-69 (2d Cir. 2017) (rejecting applicability of but-for causation standard to Family Medical Leave Act retaliation claim because of that statute's particular text). Neither their holdings nor their reasoning, then, directly conflict with our precedent on the FHA. Taking seriously our adherence to Circuit precedent, we therefore conclude that such precedent remains "binding authority from which we cannot deviate." *Peguero*, 34 F.4th at 158.

Accordingly, the district court did not err in applying a motivating-factor causation to Gilead's disparate treatment and retaliation claims under the FHA consistent with our precedent.

## II. Vicarious Liability

Cromwell also argues that the district court wrongly allowed

14

the jury to find it liable for the actions of its officials through vicarious liability. Drawing on case law under Section 1983, the town argues that it should only be liable for official policies or customs and not merely on account of actions taken by town officials in the scope of their employment. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690-94 (1978). The problem with this argument, though, is that the doctrine under Section 1983 that Cromwell asks us to adopt is grounded in the unique text and history of that law, which find no analogue in the FHA. It is clear and undisputed that the FHA generally allows for vicarious liability, and we reject Cromwell's invitation to create a judicial carve-out from that liability for local governments when Congress itself has declined to do so.

"[I]t is well established that the [Fair Housing] Act provides for vicarious liability." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). The Supreme Court has held that the FHA incorporates this standard background principle from the common law of torts, placing "liability without fault upon [an] employer in accordance with traditional agency principles." *Id.* at 282.

Equally clear (and undisputed by Cromwell) is that municipalities are generally liable under the FHA. The statute refers to the "person against whom" a discriminatory housing practice is alleged in a private suit, 42 U.S.C. § 3613(b), and defines "person" broadly to include corporations, *id.* § 3602(d); *see also Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 126 (2003) (discussing understanding of municipalities as corporations "going back at least to Coke"). Indeed, the Supreme Court has identified "unlawful *zoning laws* and other housing restrictions" as "at the heartland of

15

disparate-impact liability" under the FHA. *Inclusive Communities*, 576 U.S. at 521 (emphasis added); *see also Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999) (noting that the FHA "appl[ies] to municipal zoning decisions"). And legislative history confirms that discrimination by municipal actors was one of Congress's particular concerns in adding prohibitions on disability discrimination to the FHA in 1988. *See* H.R. Rep. No. 100-711, at 24 (1988) (observing that "state and local governments have authority . . . to regulate use of land, [which] has sometimes been used to restrict the ability of individuals with handicaps to live in communities" and noting that disability provisions would "apply to state or local . . . laws, regulations, practices or decisions").

The FHA makes no special rules for municipal liability. *Meyer* therefore means that municipalities are subject to vicarious liability just like any other FHA defendant. Essentially, Cromwell asks this Court to craft a judicial exception from the ordinary principles of liability under the FHA for municipal defendants. Its only justification for doing so is the *Monell* doctrine under Section 1983, which it assumes should apply under all antidiscrimination statutes. But the town offers no persuasive reason to apply the law of Section 1983, which is based on the particular text and history of that statute, to the FHA.

The reasoning of *Monell* is clearly based on the text of Section 1983, which creates a cause of action against someone who "subjects, or *causes to be subjected*," any person to the deprivation of federal civil rights, 42 U.S.C. § 1983 (emphasis added), and on the unique legislative history behind Section 1983, which evidences serious

16

congressional concern about the extent of municipal liability. *See Monell*, 436 U.S. at 665-95. And the Supreme Court has characterized the opinion's rationale in this way multiple times. *See Bd. of County, Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997) (explaining *Monell* as resting "on the language of § 1983 itself" and on "the statute's legislative history"); *City of St. Louis v. Prapotnik*, 485 U.S. 112, 122 (1988) (summarizing *Monell* as "[r]eading the statute's language in the light of its legislative history"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-79 (1986) ("Primarily, however, our conclusion [in *Monell*] rested upon the legislative history[.]").

Thus, it would make little sense to adopt *Monell* as governing all federal civil rights laws by default, as the town of Cromwell urges. On the contrary, "*Monell*'s holding remains the exception to the general rule" of vicarious liability. *United States v. Town of Colorado City*, 935 F.3d 804, 808 (9th Cir. 2019).

And there are no indications that Congress intended the FHA to be one more exception to the general rule. The statute does not contain Section 1983's "causes to be subjected" language, which the *Monell* Court relied on as evidence that Congress did not intend vicarious liability to attach under that statute. *See Monell*, 436 U.S. at 692. Indeed, the Supreme Court has already held in *Meyer* that the FHA's text generally imposes the traditional form of vicarious liability. *See Meyer*, 537 U.S. at 285-87; *see also id.* at 286 ("Congress' silence, while permitting an inference that Congress intended to apply *ordinary* background tort principles, cannot show that it intended to apply an unusual modification of those rules."). Nor is there any legislative history suggesting any concerns about the extent

17

of municipal liability as under Section 1983.

There is simply no basis to apply the *Monell* doctrine to the FHA. The district court did not err in subjecting the town of Cromwell to vicarious liability for the discriminatory acts of its officials.

## III.     Availability of Punitive Damages

With its final statutory argument, Cromwell once again seeks support from case law interpreting other statutes and once again founders when confronting the FHA itself. The FHA explicitly allows for "actual and punitive damages" in suits brought by private plaintiffs. 42 U.S.C. § 3613(c)(1). Nor are punitive damages an afterthought in this context. In the 1988 amendment of the FHA, Congress specifically decided to remove a previous cap on the amount of punitive damages available, seeking to ensure adequate punishment and deterrence of housing discrimination. *See Littlefield v. McGuffey*, 954 F.2d 1337, 1345 (7th Cir. 1992) (describing the effect of the amendment). Cromwell argues, however, that when it expressly allowed for punitive damages in FHA suits, Congress silently meant to shield municipalities from their reach. It did not.

Cromwell principally relies on *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), a Supreme Court decision interpreting Section 1983. The town also attempts to rely on *Barnes v. Gorman*, 536 U.S. 181 (2002), but that decision concluded that punitive damages are unavailable under the ADA and Rehabilitation Act based on Spending Clause principles that are wholly irrelevant to the FHA. *See Barnes*, 536 U.S. at 185-89.

In *Fact Concerts*, the Court held that punitive damages are

unavailable against a municipality under Section 1983, which does not explicitly mention punitive damages. 453 U.S. at 271. It explained that "[t]he general rule today is that no punitive damages are allowed unless expressly authorized by statute," and that there is a common-law presumption against the availability of punitive damages from municipalities. *See id.* at 259-64 & n.21. The Court then found nothing in the legislative history suggesting congressional intent to override that presumption.

Here, by contrast, the FHA's text easily and unequivocally rebuts the common-law presumption. To be sure, the statute does not specifically say that punitive damages are available *against municipalities*. But Congress does not need to speak with such granular detail on the issue. The language of the FHA is broad but clear: Private plaintiffs suing under the FHA may obtain "actual and punitive damages" with no textually specified exceptions. 42 U.S.C. § 3613(c)(1). "As a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text." *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 376 (1990). And in fact, when Congress has desired to carve local governments out from generally applicable remedies under a statute, it has said so clearly. *See* 42 U.S.C. § 1981a(b)(1) (exempting "a government, government agency or political subdivision" from otherwise available punitive damages).

Our straightforward conclusion is supported by several persuasive authorities. When a statute explicitly provides for certain remedies in general, and generally applies to municipal defendants, it necessarily subjects those defendants to those remedies. That is

19

how the Supreme Court reasoned in holding that treble damages, while partly punitive, are available against municipalities under the False Claims Act. *See Cook County*, 538 U.S. at 132-33. It is how this Court reasoned in holding that liquidated damages under the ADEA, which we recognized as punitive in nature, are available against municipalities. *See Cross v. New York City Transit Auth.*, 417 F.3d 241, 254-56 (2d Cir. 2005). And it is how the Eleventh Circuit reasoned in refusing to exempt municipal defendants from the punitive damages made generally available by the text of the Driver's Privacy Protection Act. *See Truesdell v. Thomas*, 889 F.3d 719, 724-25 (11th Cir. 2018).

Finally, we note that when confronted with a similar statutory structure, the Supreme Court unanimously held that the Fair Credit Reporting Act, which creates a cause of action and includes the federal government in its definition of covered defendants, waives the government's sovereign immunity—even though the statute does not specifically address that issue and even though a stringent clear statement rule applies to waivers of sovereign immunity. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 144 S. Ct. 457, 468 (2024). A fortiori, the same reasoning applies to the comparably weaker presumption at issue here. Congress did not need to specifically authorize punitive damages against municipalities. Authorizing punitive damages without exception in a statute that generally subjects municipalities to liability was sufficient.

If there were any doubt, the statutory and legislative history behind the FHA further reinforces this conclusion. As noted above, legislative history suggests that, when Congress amended the FHA in 1988, it was well aware that the statute reached municipal defendants.

20

*See* H.R. Rep. No. 100-711, at 24 (1988) ("These new subsections would also apply to state or local . . . laws, regulations, practices, or decisions[.]"). And it was in the 1988 amendments that Congress lifted the FHA's earlier $1000 cap on punitive damages. Congress thus increased the availability of punitive damages at the same time it was clearly contemplating municipal liability in general. It strains credulity to think that Congress intended to prohibit or curtail punitive damages against municipalities *sub silentio* through the very amendment that greatly expanded the availability of those damages.

Without a basis in the text or history of the FHA, Cromwell resorts to policy arguments, emphasizing the risk that blameless taxpayers will end up bearing the brunt of these damages. Of course, there are policy arguments on the other side of the equation, as well, such as the need to adequately deter towns from discriminatory conduct that might be cost-efficient because it leads to relatively small compensatory damages. *See, e.g.*, *Ciraolo v. City of New York*, 216 F.3d 236, 242-50 (2d Cir. 2000) (Calabresi, J., concurring); *see also* Br. of City of Middletown as Amicus Curiae at 8-9 (stressing the importance of deterring town officials from capitulating to the discriminatory wishes of constituents). Ultimately, though, these policy arguments are beside the point for our purposes. Congress made its own policy judgment when it enacted and amended the FHA, and that judgment, which we will not disturb, was to impose punitive damages on municipalities that discriminate in the area of housing.

We therefore affirm the judgment below as to the town of Cromwell's liability, including for punitive damages, under the FHA.

## IV.        Amount of Punitive Damages

In light of the conclusions above, the final issue for our consideration is whether the $5 million award of punitive damages that the jury assessed against the town was unconstitutionally excessive.  Our constitutional review of punitive damages is *de novo*, *see Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 431 (2001), and for the reasons below we conclude that the punitive damages award in this case does not comport with due process.

The Supreme Court has established three guideposts for evaluating when the amount of punitive damages becomes so excessive that it crosses the line into arbitrariness, violating due process.  *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419-28 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-85 (1996).  The first is the reprehensibility of the defendant's conduct, which the Supreme Court has characterized as "[t]he most important indicium of the reasonableness of a punitive damages award."  *Gore*, 517 U.S. at 575.  The second is the "ratio between harm, or potential harm, to the plaintiff and the punitive damages award," often captured as the ratio of punitive to compensatory damages.  *State Farm*, 538 U.S. at 424.  And the third is "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases," *State Farm*, 538 U.S. at 428 (quotation marks omitted), looking for comparison to "legislative judgments concerning appropriate sanctions for the conduct at issue," *BMW*, 517 U.S. at 583 (quotation marks omitted).

Here, there was ample evidence of highly reprehensible conduct by the town of Cromwell.  The town engaged in a deliberate

22

and sustained campaign of discrimination and retaliation, reflecting "repeated actions" rather than "an isolated incident" and resulting from "intentional malice" rather than "mere accident." *State Farm*, 538 U.S. at 419. The town also "evinced an indifference to or reckless disregard of the health or safety of others," when its police officers leaked sensitive medical information about a Gilead resident to the public and failed to investigate an episode of vandalism of Gilead's group home. *Id.* And the ultimate targets of the town's conduct, the residents with disabilities who relied on Gilead's housing, "had financial vulnerability." *Id.* Finally, it bears remembering that Cromwell officials not only violated the FHA but also publicly celebrated when their discriminatory efforts succeeded in keeping Gilead's residents out of town. This is a case where "further sanctions" beyond compensatory damages are warranted "to achieve punishment [and] deterrence." *Id.*

The first factor thus weighs in favor of a substantial award of punitive damages. The second, however, gives us pause. The ratio between punitive and compensatory damages in this case is approximately 27.6 to 1. While the Supreme Court has eschewed mathematical formulae or any bright-line rule about constitutionally permissible ratios, it has cautioned that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425. True, "the propriety of the ratio can vary enormously with the particular facts of the case." *Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013). But we are not persuaded that the facts of this case can justify the facially excessive ratio here.

Gilead argues that higher ratios may be permissible when "the monetary value of noneconomic harm might have been difficult to determine." *State Farm*, 538 U.S. at 425 (quotation marks omitted). And indeed here, it is difficult to measure the harm of Gilead being unable to provide housing to its intended residents and the intangible harms of the unabashed discrimination that Cromwell engaged in and openly celebrated. After all, "violations of civil rights" are often "'particularly egregious' acts that result in ... injuries whose monetary value is 'difficult to determine.'" *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) (quoting *BMW*, 517 U.S. at 582); *see also Lincoln v. Case*, 340 F.3d 283, 293-94 (5th Cir. 2003) (noting that "the inherently low or hard-to-determine actual injuries in housing discrimination cases" render "[a] high ratio of punitives to compensatory damages ... far less troubling" in FHA cases). But this is not a case in which "a particularly egregious act has resulted in only a small amount of economic damages." *State Farm*, 538 U.S. at 425. The difficult-to-measure harms of Cromwell's discrimination do support a relatively high ratio, but cannot support one as high as this.

Gilead also urges that we must consider not only the harms it actually suffered as quantified by the jury's compensatory damages award, but also the potential harm of the town's conduct. "[T]he proper inquiry is whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." *BMW*, 517 U.S. at 581 (quoting *TXO Production Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993) (plurality opinion)); *see also State Farm*, 538 U.S. at 424 (looking to "the ratio between harm, or potential harm, to

24

the plaintiff and the punitive damages award").

Gilead points us to the fact that it had to forfeit a contract with a state agency worth $866,152 in yearly funding to the organization. The total loss in funding from the closure of the home to the time of trial was estimated at roughly $4.7 million, which Gilead suggests we can consider as potential harm. But relevant potential harm is "harm to the victim that would have ensued if the [defendant's] tortious plan had succeeded." *BMW*, 517 U.S. at 582. Gilead's forfeited contract is harm that did ensue, which Gilead claimed as an actual loss but which the jury refused to include in its award of compensatory damages. That is not the kind of likely but unrealized harm that would change the relevant ratio for our constitutional analysis. In short, despite Gilead's best efforts, the 27.6 to 1 ratio of punitive to compensatory damages remains far beyond the range most likely to survive constitutional scrutiny.

Finally, we consider the relationship between the punitive damages award and available penalties for similar conduct. The FHA imposes a $50,000 fine for a first-time violation and $100,000 for subsequent violations in enforcement actions brought by the attorney general. *See* 42 U.S.C. § 3614(d)(1)(C). And in HUD administrative enforcement proceedings, first-time offenders risk civil penalties of approximately $25,000 per discriminatory housing practice, and repeat offenders approximately $64,000 or $128,000 depending on how many prior violations they have committed. *See* 24 C.F.R. § 180.671(a). To be sure, those penalties do not apply in private enforcement actions, and Congress specifically lifted a prior statutory cap on the punitive damages available in such proceedings. But they

remain an instructive benchmark for what Congress has thought to be appropriate punishment for violations of the FHA. And since that benchmark is significantly lower than the punitive damages award in this case, it further suggests that the award crossed the boundaries of due process.

In all, the high degree of reprehensibility of Cromwell's conduct supports a significant award of punitive damages. And the fact that Cromwell's discrimination inflicted non-economic harms that may not be easily quantifiable likewise suggests that even a relatively high ratio of punitive to compensatory damages can survive constitutional scrutiny in this case. But the 27.6 to 1 ratio here is simply too high, as confirmed by the much lower civil penalties available for comparable conduct. We conclude that the jury's award of punitive damages is unconstitutionally excessive and that the maximum sustainable amount of punitive damages is $2 million.

## CONCLUSION

We conclude that the district court did not err in applying motivating-factor causation to Gilead's disparate treatment and retaliation claims under the FHA, in subjecting Cromwell to vicarious liability, and in allowing the jury to assess punitive damages against the town. However, we conclude that the amount of punitive damages awarded is so grossly excessive as to violate due process. We therefore remand with instructions for the district court to grant a new trial on the issue of punitive damages unless Gilead agrees to a remittitur reducing the punitive damages to $2 million. Accordingly, the judgment of the United States District Court for the District of

26

Connecticut is **AFFIRMED** in part, **VACATED** in part, and **REMANDED** for further proceedings.